[No. 45864.  En Banc.  August 2, 1979.]

FREDERICK N. MCDONALD, *Appellant,* v. JOHN
R. HOGNESS, ET AL, *Respondents.*

*Richard B. Sanders,* for appellant.

*Slade Gorton, Attorney General, James B. Wilson, Senior Assistant,* and *Steve Milam, Assistant,* for respondents.

WRIGHT, J.—Frederick N. McDonald, an unsuccessful applicant to the University of Washington (U.W.) School of Medicine, seeks admission to the school and damages. In the trial court he alleged that in denying his application for the 1976 entering (E–76) class the school discriminated against him racially in violation of the Fourteenth Amendment,[1] Title 6 of the 1964 Civil Rights Act[2] and 42 U.S.C. 1983.[3] He also asserted that the school's admission process is arbitrary and capricious as was the treatment of

---

[1] U.S. Const. amend. 14, § 1 reads in part: "nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

[2] Section 601, Title 6 of the 1964 Civil Rights Act (42 U.S.C. § 2000d) states:
"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

[3] 42 U.S.C. § 1983 reads:
"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen

his application. The trial judge dismissed the action after McDonald rested his case. McDonald appealed. The Court of Appeals, Division One, certified the case to this court.

There are two major questions. First, does a state medical school's admission policy deny equal protection when it considers race as a factor in evaluating applications? Second, are the admission standards and procedures of the U.W. medical school arbitrary and capricious, and did their application to McDonald constitute arbitrary and capricious action?

For the E–76 year, 1,703 individuals applied, and 175 could be admitted. Of the 175 positions, 50 were earmarked for qualified residents of Alaska, Montana and Idaho under the Washington, Alaska, Montana and Idaho (WAMI) program, a system of regional medical education. *See* RCW 28B.15.225 and RCW 28B.70. Another two seats were earmarked for another special program. Selection factors were set forth in Medical School Admissions Requirements 1976–77, at page 304, as follows:

> Candidates are considered comparatively on the basis of academic performance, medical aptitude, motivation, maturity, and demonstrated humanitarian qualities. Extenuating background circumstances are considered as they relate to these selection factors.

*And see Bulletin of U.W. School of Medicine,* 1975 and 1976.

Medical school personnel believe grade–point average (GPA) is the best measure of academic performance, while the Medical College Admissions Test (MCAT) score is the best measure of medical aptitude. Noncognitive criteria— motivation, maturity and demonstrated humanitarian qualities—are assessed from the applicant's file and the interview. McDonald, a Washington resident, had a cumulative undergraduate GPA of 3.58 out of 4.0 at the time he

---

of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

applied. He allegedly scored in the top 5 percent nationally on the MCAT.[4] Though the trial court found McDonald qualified, it said his overall credentials were comparatively average.

The medical school's selection process was aptly summarized by the trial court:

> [T]he Committee on Admissions functions simultaneously at three levels. . . . Generally, the paper credentials of each applicant are reviewed independently by two members of the Admissions Committee. . . . [C]andidates considered potentially competitive . . . are invited to meet with an interview–conference committee. . . . Interview–conference committees evaluate the candidates' paper credentials and the candidates . . . and forward their evaluations to the Executive Committee [EXCOM] of the Committee on Admissions as a part of each . . . application. . . . [The EXCOM], which reviews applicants in the context of the total applicant pool, makes final determinations.

The "first screen" score calculated upon receipt of an application is based on GPA and MCAT. It is the "bright–line" test for referral to the admissions committee and is considered later by admissions committee application readers and interview–conference committee members. Of the 1,703 applicants, 816 were referred to the reading committee. Interviews were granted to 546 applicants considered potentially competitive by reading committee analyses.

The interview–conference committee evaluates the candidate and his paper credentials in terms of published selection factors and identifies strengths and weaknesses. Before each interview–conference, each committee member reviews a copy of the candidate's application file, including letters of recommendation. Members are provided at each session with written guidelines and forms for comments.

---

[4]

| | McDonald's MCAT Scores | Total E–76 Accepted Class Mean MCAT Scores |
|---|---|---|
| Verbal | 97% | 76% |
| Quantitative | 69% | 77% |
| General Information | 91% | 69% |
| Science | 95% | 86% |

After the 20– to 30–minute interview the candidate is excused and each member independently places the applicant in one of four categories: (1) Unacceptable (specific deficiencies); (2) Possible (with comparative deficiencies academically and/or with regard to noncognitive features); (3) Acceptable (no deficiencies that are not balanced by other abilities, would be an average medical student); and (4) Outstanding (no apparent deficiencies, high probability of making an excellent physician and scholar). Following each interview–conference, committee staff calculate an average of the individual committee members' ratings based on a scale of 4 for "outstanding" downward through 1 for "unacceptable". The average is entered on the inter-view–conference summary.

The Skeletal Consideration List (SCL) serves as a rough agenda for EXCOM selection meetings. Placement is determined by one's total score—first screen score plus interview–conference score—grouped again in categories 4, 3, 2 and 1. Placement in category 2 or 1 nearly always leads to application denial. McDonald averaged 2.17 on the interview and was placed in category 2. His SCL position was at the number 237 level. When corrected for "ties" of 546 candidates interviewed for 175 slots, more than 300 placed higher than McDonald. However, every Black, Chicano and American Indian placing higher than McDonald on the SCL had a lower "first screen" score than he did. On April 30, 1976, EXCOM voted that all candidates not otherwise acted upon, which included McDonald, be considered noncompetitive for the E–76 class, and his application was denied.

The first question is whether using race as a positive factor in a state medical school's admission policy and process violates the equal protection clause of the Fourteenth Amendment and section 601, Title 6 of the 1964 Civil Rights Act (42 U.S.C. § 2000d). We conclude that it does not.

At the outset, we note that the evidence shows McDonald would not have been admitted into the E–76 class even

absent the six minority persons accepted and without any consideration of race.[5] This alone is justification for denying relief on equal protection grounds. *Alevy v. Downstate Medical Center,* 39 N.Y.2d 326, 338, 348 N.E.2d 537, 547, 384 N.Y.S.2d 82, 91 (1976). However, because of the public importance of the issue and the likelihood of its recurrence, we will consider the broader question. Under the Supreme Court majority's analysis in *Regents of Univ. of Cal. v. Bakke,* 438 U.S. 265, 57 L. Ed. 2d 750, 98 S. Ct. 2733 (1978), if the admission program does not violate the Fourteenth Amendment, it does not violate section 601 of Title 6. *Regents of Univ. of Cal. v. Bakke, supra* at 325. Accordingly, we shall emphasize the equal protection issue.

McDonald states that the U.W. medical school's practice is to admit all qualified minority persons because of race, but not all qualified nonminority individuals. Nonminority candidates are forced to compete with one another for the remaining seats, a "competitive disadvantage." The organizational focus of McDonald's criticism is the interview–conference committee, which purportedly puts the minority applicant with basic credentials (adequate MCAT and GPA) in a position on the SCL which "assures ultimate acceptance". Nonminority individuals with better "first

---

[5]Finding of fact No. 18 states McDonald "would not have been admitted even if all six of the minority applicants [admitted] were removed. Plaintiff McDonald was not on the [18–person] designated alternate list . . ." During redirect examination, Dr. Benjamin Belknap, admissions committee chairman, stated anyone not on the alternate list would not have been admitted. He also indicated that absent any racial consideration or criteria employed, McDonald would not have been admitted. McDonald also had very low placement on the SCL. See page 435.

This case differs from *Bakke v. Regents of Univ. of Cal.,* 18 Cal. 3d 34, 553 P.2d 1152, 132 Cal. Rptr. 680 (1976), where the University of California conceded it could not meet its burden of showing Bakke would not have been admitted absent the racial preference. There Bakke's overall "benchmark" or total score in 1973, which included GPA, MCAT and subjective elements like letters of recommendation and the interview rating, barely missed the cutoff (see page 437) at the time when four seats reserved for minorities were unfilled. In contrast, McDonald's overall rating—based on the interview and subjective, noncognitive criteria as well as on his objective "first screen" score—is relatively low, as reflected in his placement on the SCL.

screen" scores than some minority persons are denied "extra points" afforded minority applicants which would place them in favored SCL categories. "If Fred McDonald were Black, he would have gotten a higher score on the interview," appellant declares.

First, McDonald inaccurately describes the U.W. system. As respondent points out and as the record shows, not all qualified minority persons are admitted by the medical school. Seven minority persons ranked higher than McDonald on the 1976 Skeletal Consideration List and were not offered admission. Approximately 30 minority applicants in the interview–conference pool were not offered admission.

Furthermore, analysis of *Regents of Univ. of Cal. v. Bakke, supra,* shows the school of medicine's admission policies and procedures do not violate the equal protection clause of the Fourteenth Amendment.[6] In *Bakke,* the Medical School of the University of California at Davis had two admission programs for the entering class of 100 students— the regular and special programs. A separate committee operated the special program, and selected only minority applicants to fill 16 positions reserved for them.

Bakke, a white male, applied to the Davis medical school in both 1973 and 1974. His application was considered by the general admission program and he was interviewed in both years. In 1973 he had a strong "benchmark" or overall score of 468 out of 500 but no applications with scores below 470 were accepted after Bakke's was completed. In both years, Bakke was denied admission while applicants were admitted under the special program with grade–point

---

[6]Under *DeFunis v. Odegaard,* 82 Wn.2d 11, 37 n.16, 507 P.2d 1169 (1973), "the equal protection clause of U.S. Const. amend. 14, and the privileges and immunities clause of Const. art. 1, § 12, have the same import" and are applied as one. *Northshore School Dist. 417 v. Kinnear,* 84 Wn.2d 685, 720–21, 530 P.2d 178 (1974); *Markham Advertising Co. v. State,* 73 Wn.2d 405, 427, 439 P.2d 248 (1968). Consequently, since the school of medicine's system is constitutional under the federal constitutional provision, it is constitutional under the Washington counterpart.

averages and MCAT scores significantly lower than Bakke's.

Bakke sued, seeking admission. He alleged the special admission program excluded him on a racial basis, in violation of his rights under the equal protection clause of the Fourteenth Amendment, the state privileges and immunities clause and section 601, Title 6 of the 1964 Civil Rights Act (42 U.S.C. § 2000d). The trial court held the program violative of both the constitutional and statutory provisions. Ignoring the state constitutional and statutory grounds, the California Supreme Court held the program violated the equal protection clause of the Fourteenth Amendment. *Bakke v. Regents of Univ. of Cal.,* 18 Cal. 3d 34, 553 P.2d 1152, 132 Cal. Rptr. 680 (1976).

Five members of the United States Supreme Court voted to affirm the judgment of the California court ordering that respondent Bakke be admitted to Davis. Mr. Justice Powell based his decision to affirm on a finding the program violated the equal protection clause. Mr. Chief Justice Burger and Justices Stewart, Rehnquist and Stevens avoided the constitutional issue we confront here, holding instead that the university excluded Bakke from participation in its medical education program because of his race in violation of section 601, Title 6 of the 1964 Civil Rights Act (42 U.S.C. § 2000d). Four justices, Brennan, White, Marshall and Blackmun, dissenting, found the admission program valid on the constitutional ground.

Appellant argues that *Bakke* supports his position because here all qualified minority applicants are admitted while nonminority applicants are forced to compete among themselves as in Bakke for the remaining seats. But this admission program significantly differs from that at Davis. Appellant concedes that a quota or target number of minority applicant admissions is not involved. Further, there is not a separate admission system isolating minority persons from competition with nonminority persons as in *Bakke*; the university "gave no separate consideration or

separate treatment" to Black, Chicano and American Indian applicants interviewed.

▮ Separate consideration of minority applicants is discouraged by Mr. Justice Powell in his *Bakke* opinion. Under Mr. Justice Powell's opinion, the use of race is impermissible where one group is cut off solely on a racial basis from competition with others. On the other hand, Powell considers the use of race in admissions permissible if it (1) is designed to promote a compelling state interest, and (2) does not insulate an applicant from competition with remaining applicants.

In applying his test, Mr. Justice Powell characterizes the goal of the attainment of a diverse student body as compelling, stressing that the freedom to select a student body is an element of academic freedom, a special First Amendment concern.[7] *Regents of Univ. of Cal. v. Bakke, supra* at 312. He explains that this diversity encompasses a broad array of qualifications and characteristics of which racial

---

[7]The University of Washington argues that the denial of McDonald's application was an exercise of its constitutionally protected freedom to decide who shall be admitted to study. It quotes Mr. Justice Frankfurter's concurring opinion in *Sweezy v. New Hampshire,* 354 U.S. 234, 263, 1 L. Ed. 2d 1311, 1332, 77 S. Ct. 1203, 1218 (1957), also quoted by Mr. Justice Powell in *Bakke,* at 438 U.S. 312:

"'It is the business of a university to provide that atmosphere which is most conducive to speculation, experiment and creation. It is an atmosphere in which there prevail "the four essential freedoms" of a university—to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study.'"

Mr. Justice Powell also relies on *Keyishian v. Board of Regents,* 385 U.S. 589, 603, 17 L. Ed. 2d 629, 640, 87 S. Ct. 675, 683 (1967), where the court noted a national commitment to safeguarding an academic freedom

of transcendent value to all of us and . . . therefore a special concern of the First Amendment . . . The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth "out of a multitude of tongues . . ."

Like Mr. Justice Powell, we believe that the atmosphere of "speculation, experimentation and creation" is promoted by a diverse student body. We agree that in seeking diversity, the U.W. medical school must be viewed "as seeking to achieve a goal that is of paramount importance in the fulfillment of its mission." *Regents of Univ. of Cal. v. Bakke, supra* at 313. But though a university must have wide discretion in making admission judgments, "constitutional limitations protecting individual rights may not be disregarded." *Bakke,* at 314.

origin is a single element. *Regents of Univ. of Cal. v. Bakke, supra at 314.* He concludes from the experience of other university admission programs which take race into account in achieving diversity that the assignment of a fixed number of places to a minority group is not necessary. *Regents of Univ. of Cal. v. Bakke, supra* at 316.

In *dicta,* Mr. Justice Powell indicates that the Harvard admission plan, which like the plan here employs race as an admission factor, furthers a compelling state interest in diversity of the student body. *Regents of Univ. of Cal. v. Bakke, supra* at 316–18. Justices Brennan, White, Marshall and Blackmun also found the Harvard plan constitutional under their approach. *Regents of Univ. of Cal. v. Bakke, supra* at 326 n.1. Thus, a majority of the court find constitutional a plan without a quota or separate consideration for minority groups but where race may be a beneficial factor. The University of Washington School of Medicine's admission policies and procedures have the same redeeming characteristics.

McDonald argues there is no finding the classification here serves a compelling or substantial interest, or is necessary to realize such an interest. As respondent emphasizes, however, both in seeking diversity[8] and in fulfilling the *DeFunis* mandate of "promoting integration in

---

[8]Finding of fact No. 15, not challenged by McDonald, indicates a purpose of promoting diversity in the student body and not just a purpose of serving medical needs of the region:

Consistent with overall University of Washington policy, the University's School of Medicine and its faculty have determined that *in order to best serve the educational needs of the medical school* and to better serve the medical professional needs of this region, it is essential that the school of medicine should seek greater representation of certain minority groups in its classes *where there has been serious under–representation in the school* and in the medical profession. . . . The medical school and its faculty have also determined that some members of minority groups may have suffered cultural and educational disadvantages by virtue of their ethnic background, and have determined that such disadvantages are properly to be considered when evaluating the overall qualifications of such an applicant.

(Italics ours.)

public education," the school of medicine has a compelling state interest permitting consideration of race. The Washington plan also fulfills the second element of Mr. Justice Powell's test. The system assures competition among applicants, thereby avoiding "denial of individualized consideration," the principal evil of the Davis plan. *Regents of Univ. of Cal. v. Bakke,* 438 U.S. 265, 318 n.52, 57 L. Ed. 2d 750, 789 n.52, 98 S. Ct. 2733, 2763 n.52 (1978).

In the second *Bakke* opinion which supports the U.W. medical school on this issue, Justices Brennan, White, Marshall and Blackmun pronounce the Davis program constitutionally valid. In their opinion, the state need only show the racial criteria (1) serves an important, articulated purpose, (2) does not stigmatize any discrete group, and (3) is reasonably used in light of the program's objectives. *Regents of Univ. of Cal. v. Bakke, supra* at 361. The Brennan group believes Davis' goal of admitting students disadvantaged by effects of past discrimination is sufficiently important. They reasonably read Mr. Justice Powell's opinion as agreeing this can constitute a compelling purpose. *Regents of Univ. of Cal. v. Bakke, supra* at 366 n.42.

In *DeFunis v. Odegaard,* 82 Wn.2d 11, 507 P.2d 1169 (1973), this court rejected the argument that a state law school violated equal protection rights by denying plaintiff admission, yet accepting minority applicants with lower objective indicators than plaintiff. We stressed gross underrepresentation in law schools and the legal profession in finding an overriding interest in promoting integration in public education. We held the interest in eliminating racial

McDonald's claim that admissions committee chairman Belknap's testimony shows a purpose of serving regional medical manpower needs and not a purpose of promoting educational diversity is unsupported by the record. The record also refutes the contention Belknap was not referring to diversity in Powell's broad sense, which involves consideration of race in conjunction with other attributes.

imbalance within public legal education is compelling. *DeFunis v. Odegaard, supra* at 33.[9]

In the instant case the trial court determined the school had decided that in order to serve the educational needs of the school and the medical needs of the region, the school should seek greater representation of minorities "where there has been serious underrepresentation in the school and in the medical profession." Thus, the program furthers a compelling purpose of eliminating racial imbalance within public medical education.

Furthermore, the program here meets the additional elements of the Brennan group's test. The racial classification does not stigmatize any discrete group and is reasonably used in light of its objectives.

As noted by Mr. Justice Powell in *Bakke* and by this court in *DeFunis,* it is not enough that a state can show that its purpose is substantial or compelling. The use of race, a suspect classification, must be necessary to the accomplishment of its purpose. *Regents of Univ. of Cal. v. Bakke, supra* at 305; *DeFunis v. Odegaard,* 82 Wn.2d 11, 32, 507 P.2d 1169 (1973); *Nielsen v. State Bar Ass'n,* 90 Wn.2d 818, 820, 585 P.2d 1191 (1978). Though the Davis plan failed this element of Powell's test in *Bakke,* he indicated that a program under which race is but one factor in achieving diversity would survive it. In addition, this court found necessary in *DeFunis* a law school admissions policy which provided that minority applicants were compared to one another but not with nonminority applicants. Since the program here does not involve consideration of minority applicants apart from others, it appears to meet both the Powell *Bakke* and *DeFunis* standards of necessity.

---

[9]The United States Supreme Court granted certiorari, *DeFunis v. Odegaard,* 414 U.S. 1038, 38 L. Ed. 2d 329, 94 S. Ct. 538 (1973), but later declared the case moot and refused to decide the constitutional issue. *Defunis v. Odegaard,* 416 U.S. 312, 40 L. Ed. 2d 164, 94 S. Ct. 1704 (1974). On remand, a plurality of this court reaffirmed its previous judgment. *DeFunis v. Odegaard,* 84 Wn.2d 617, 529 P.2d 438 (1974).

The University of Washington School of Medicine admissions program survives both the Powell and Brennan group tests. Moreover, a majority of the *Bakke* court stated race may be a factor in a state medical school's admissions program. Justice Powell joined the Brennan group in reversing the portion of the California court's judgment enjoining Davis from considering the race of any applicant. *Regents of Univ. of Cal. v. Bakke, supra* at 326. Thus, the *Bakke* majority followed the lead of this court which held in *DeFunis* that "consideration of race as a factor in the admissions policy of a state law school is not a per se violation of the equal protection clause of the Fourteenth Amendment." *DeFunis v. Odegaard, supra* at 31. *Alevy v. Downstate Medical Center,* 39 N.Y.2d 326, 348 N.E.2d 537, 384 N.Y.S.2d 82 (1976).

Finally, McDonald asserts that Mr. Justice Stevens' opinion, in which Mr. Chief Justice Burger, and Justices Stewart and Rehnquist joined, would not even permit "racial discrimination" under the Harvard plan. By implication, in appellant's view the Stevens opinion condemns the U.W. medical school's program, which also uses race as one of many admission factors. As indicated earlier, however, a majority said the Harvard approach is constitutional. Stevens relied exclusively on the federal statute, avoiding the constitutional issue. The Stevens group held only that the Davis medical school excluded Bakke from its program of medical education in violation of section 601, Title 6 of the 1964 Civil Rights Act (42 U.S.C. § 2000d). We think the substantial differences between the Davis and U.W. programs render the Stevens holding inapplicable. Here, there was not a quota excluding McDonald from competing for a certain group of seats.

The University of Washington School of Medicine's admission policies and procedures survive the *Bakke* Powell and Brennan equal protection tests, using race as an admission factor in a manner permitted under both *Bakke* and *DeFunis*. Accordingly, we hold that the use of race in these policies and procedures does not offend the equal

protection clause of the fourteenth amendment to the United States Constitution.

McDonald's second major argument is that the medical school's admission policies and procedures are arbitrary and capricious and that their application to him constituted arbitrary and capricious action. As part of this argument, he urges that the delegation of authority to the Board of Regents to set admission requirements denies due process and violates equal protection rights under U.S. Const. amend. 14 and Const. art. 1, § 12 because it contains no standards prescribing how that authority is to be exercised. Under *Barry & Barry, Inc. v. Department of Motor Vehicles,* 81 Wn.2d 155, 500 P.2d 540 (1972) and subsequent cases, the delegation survives our scrutiny.

In *Barry & Barry,* this court found a constitutional delegation in authority given to the director of the Department of Motor Vehicles to approve fee schedules and set maximum employment agency fees. Discarding the requirement of specific legislative standards, we held:

> [T]he delegation of legislative power is justified and constitutional, and the requirements of the standards doctrine are satisfied, when it can be shown (1) that the legislature has provided standards or guidelines which define in general terms what is to be done and the instrumentality or administrative body which is to accomplish it; and (2) that *procedural safeguards exist to control arbitrary administrative action and any administrative abuse of discretionary power.*

*Barry & Barry Inc. v. Department of Motor Vehicles, supra* at 159.

Applying the first part of the test, the court concluded that RCW 19.31.070—which provides for the director's issuance of reasonable rules and regulations to enforce the Employment Agency Act—was clear in indicating the rules could be issued administratively, and specifically by the director of the Department of Motor Vehicles. As to the second element, we found adequate procedural safeguards in administrative procedures act provisions providing that interested parties will be heard before rule adoption and for

judicial review to protect against arbitrary and capricious administrative action. Noting the power delegated did not admit of precise standards, we held that the director–promulgated schedule of employment agency maximum fees was a valid and constitutional delegation of legislative power.

Distinguishing *Barry & Barry,* appellant urges that here "the legislature has provided no standards or guidelines whatsoever, specific, general or otherwise . . ." Contrary to McDonald's assertion, the legislature has provided, within *Barry & Barry's* meaning, standards which define in general terms what is to be done and the administrative body to accomplish it. RCW 28B.10.050 specifically states the regents shall determine entrance requirements. Under RCW 28B.10.528, the regents are authorized to delegate to the university president or his designee any of their powers and duties.[10] RCW 28B.20.130 lists—as a general power and duty of the regents—establishment of entrance requirements. That section goes on to suggest the manner in which that authority should be exercised, providing: (1) completion of examinations may be a prerequisite to admission; (2) evidence of completion of high school or other educational institutions whose programs meet university approval may be a requirement. As in *Barry & Barry,* it is doubtful whether the task delegated is susceptible to more precise standards. Requirements in general terms may suffice when the subject matter will not admit of more specific standards. *Yakima County Clean Air Authority v. Glascam Builders, Inc.,* 85 Wn.2d 255, 258, 534 P.2d 33 (1975).

The more difficult question is whether the second element of the *Barry & Barry* test is met. Do procedural safeguards exist to control arbitrary administrative action

---

[10]Pursuant to RCW 28B.10.528, the power and duty to establish entrance requirements has been delegated to the U.W. school of medicine. Furthermore, WAC 478–160–095 states that the dean of the school of medicine is responsible for interpretation and administration of regulations governing admission of medical students.

and any administrative abuse of discretionary power? In *Barry & Barry,* administrative procedures act provisions ensured interested parties would be heard before rule adoption, as well as judicial review against arbitrary and capricious action. In subsequent cases, we repeatedly have found adequate procedural safeguards in provisions for judicial review of an agency's decision. *United Chiropractors of Wash., Inc. v. State,* 90 Wn.2d 1, 578 P.2d 38 (1978); *Polygon Corp. v. Seattle,* 90 Wn.2d 59, 578 P.2d 1309 (1978); *Spokane v. Spokane Police Guild,* 87 Wn.2d 457, 553 P.2d 1316 (1976).

RCW 28B.19, the State Higher Education Administrative Procedure Act, applies to the U.W. Board of Regents and to the medical school but exempts admission policies from rulemaking provisions, including notice and publication requirements.[11] There is not any other provision providing for judicial review of decisions of the executive committee of the committee on admissions. Nevertheless, committee decisions are subject to review as they were in *DeFunis* and the present case on the ground the committee acted arbitrarily and capriciously. The decisions are also subject to review for abuse of discretion. *See, e.g., Wilson v. Board of Governors,* 90 Wn.2d 649, 585 P.2d 136 (1978). *And see State ex rel. Bartlett v. Pantzer,* 158 Mont. 126, 489 P.2d 375 (1971) (holding denial of admission to state law school was abuse of discretion). In *Spokane v. Spokane Police Guild, supra,* we held that a statute providing for superior court review of whether an arbitrator's decision was arbitrary or capricious constituted an adequate procedural safeguard under *Barry & Barry.* Accordingly, the opportunity for limited review—even in the absence of a special statute—suffices.

---

[11]RCW 28B.19.020(2) excludes from the definition of rule any "rules, regulations, orders, statements, or policies relating primarily to . . . Standards for admission; academic advancement, academic credits, graduation and the granting of degrees". That provision concludes that "such matters need not be established by rule adopted under this chapter unless otherwise required by law."

In *Polygon Corp. v. Seattle, supra,* this court looked for safeguards in the underlying statutes, ordinances and practices of the City of Seattle. Here a review of medical school practices shows procedural safeguards. First, basic admission criteria are published and applied at all levels of the process. Competitive applicants are subject to three–tiered review involving a minimum of several admissions committee members. At the interview–conference level, interviewers are trained and familiarized with applicant files beforehand. They are provided with guidelines, including the admission criteria, and evaluation sheets to ensure some consistency in the manner in which interviews are conducted and appraised. These and other school of medicine procedures described below support our holding there are sufficient procedural safeguards to avoid arbitrary administrative action and abuse of discretion.

We now turn from the standards issue to the broader question of whether the admission policies and procedures are arbitrary and capricious and whether the process leading to the denial of McDonald's application was the same. In *DeFunis,* plaintiff similarly contended law school admissions procedures constituted arbitrary and capricious action. We applied the long–standing test:

> Arbitrary and capricious action of administrative bodies means willful and unreasoning action, without consideration and in disregard of facts or circumstances. Where there is room for two opinions, action is not arbitrary or capricious when exercised honestly and upon due consideration, even though it may be believed that an erroneous conclusion has been reached.

*DuPont–Fort Lewis School Dist. 7 v. Bruno,* 79 Wn.2d 736, 739, 489 P.2d 171 (1971).

*DeFunis v. Odegaard,* 82 Wn.2d 11, 38, 507 P.2d 1169 (1973). Plaintiff must carry the burden of proof on this issue. *State ex rel. Longview Fire Fighters Local 828 v. Longview,* 65 Wn.2d 568, 572, 399 P.2d 1 (1965).

■ McDonald first states that the published selection criteria do not provide a standard for admission or rejection. He singles out for criticism the subjective factors, motivation, maturity and demonstrated humanitarian qualities; he argues these are not definable, meaningful concepts which can be reasonably applied. *DeFunis* indicates, however, that consideration of subjective factors, or factors involving judgmental evaluation, is permissible in state professional school admissions.

Contrary to McDonald's assertion, the findings adequately support the trial court's conclusion the selection process is not arbitrary and capricious. As in *DeFunis,* the record indicates both the admissions committee and the interview–conference committee employ predetermined standards and procedures for selection. Before participating in an interview–conference, each admissions committee member serves on the reading committee to acquire experience in evaluating application files. Application readers work from a "screening" worksheet, and spend approximately 20 to 30 minutes evaluating several aspects of each application: (1) the difficulty of the applicant's undergraduate program; (2) MCAT variables; (3) outside activities; (4) motivation for medicine; (5) maturity; (6) letters of recommendation; (7) special considerations, including extenuating circumstances.

Before participating in an interview–conference, admissions committee members also attend a training session conducted by admissions committee chairman Belknap. During this session they are provided with copies of the Association of American Medical Colleges Medical School Requirements book, the School of Medicine bulletin, a screening worksheet, guidelines for interviews and a completed application to review at that session. They also are instructed on evaluating application files. If a committee member is absent, an individual meeting is scheduled with Dr. Belknap which lasts more than an hour.

At the interview–conference level, each trained interviewer is required to read his or her personal copy of each

application including the letters of recommendation, before the interview–conference. Each member spends approximately 30 minutes per review and makes notes on the application regarding areas for inquiry during the interview–conference. Guidelines given to each interviewer at each interview–conference session include: (1) a list of selection criteria; (2) MCAT and GPA mean averages for the previous year's entering class; (3) suggested guidelines for evaluation of motivation, maturity, humanitarian qualities and candidate strengths and weaknesses; (4) MCAT–suggested areas of noncognitive assessment; (5) suggested areas for discussion; (6) suggested areas for observation. The members of the interview–conference committee rate the candidate comparatively on the basis of the selection criteria, the application file and the interview.

McDonald's application was read by Dr. Belknap and a student committee member and was rated competitive by both. Subsequently, McDonald was interviewed for 22 minutes by an interview–conference committee comprised of two faculty members and one student. Each interviewer independently placed McDonald in category 2, indicating he was a possible candidate "with comparative deficiencies academically and/or with regard to noncognitive features." The interview–conference committee forwarded McDonald's application to the executive committee. That committee at its April 30, 1976, meeting voted that all candidates not acted upon be considered noncompetitive, subject to Chairman Belknap's review of the applications of interviewed candidates remaining. Belknap reviewed the remaining applications, including McDonald's. He reported to the committee that in his judgment there were not any applicants the committee would be likely to consider more competitive than those previously admitted, or made alternates, based upon committee guidelines. A May 10, 1976, letter notified McDonald his application was denied.

The foregoing standards and procedures consistently utilized and also used in evaluating McDonald's application

cannot be characterized as "willful and unreasoning, without consideration," or as exercised without "due consideration."

It is further argued that McDonald would have been admitted based on his combined GPA and MCAT ("first screen") score but was not because of his score in an interview with no demonstrated validity in measuring the three remaining selection factors. As respondent notes, the plaintiff's claims in *DeFunis* were similar. There plaintiff contended that using subjective, nonmathematical factors and weighing them differently for different applicants arbitrarily denied admission. This court declared that the exercise of judgment in evaluating an applicant's file is not arbitrary and capricious action. We explained:

> The fallacy of plaintiff's argument is the assumption that, but for the special consideration given minority applicants, selection decisions by the committee would have been based solely upon objective, measurable mathematical projections of the academic performance of applicants. Actually, although the PFYA [based on GPA and LSAT] was a very important factor, it was not the sole determinative factor for the group of students. Rather, the committee utilized the PFYA as a starting point in making its judgment . . .

*DeFunis v. Odegaard, supra* at 41.

Here, like in *DeFunis,* the score based on GPA and MCAT is not the sole criteria but instead is a starting point for consideration. Relevant subjective criteria—motivation, maturity and demonstrated humanitarian qualities—are specified in the medical school admissions book. As in *DeFunis,* letters of recommendation and the difficulty of an applicant's undergraduate program also are considered. Outside activities and extenuating circumstances are factors. The information in each applicant's file is evaluated by interview–conference committee members in light of the specified criteria and is included in their ratings. In *DeFunis* this court said, "Law school admissions need not become a game of numbers; the process should remain sensitive and flexible, with room for informed judgment in

interpreting mechanical indicators." *DeFunis v. Odegaard, supra* at 42. *See also Regents of the Univ. of Cal. v. Bakke,* 438 U.S. 265, 313–18, 57 L. Ed. 2d 750, 98 S. Ct. 2733 (1978) and *DeFunis v. Odegaard,* 416 U.S. 312, 340, 40 L. Ed. 2d 164, 182, 94 S. Ct. 1704, 1717 (1974) (Douglas, J., dissenting) (law school not bound by mechanical criteria). In short, the fact some qualified applicants are rejected and nonmathematical factors are weighed differently by different interview committee members does not show arbitrary and capricious conduct.

The university has broad discretion in admission decisions and may use subjective, noncognitive criteria. The Board of Regents alone is given authority that it may delegate to set admission requirements. Regulations and policies relating to admissions are exempt from rulemaking provisions of the State Higher Education Administrative Procedure Act. Thus, it is evident that the legislature intended to vest broad discretion in the university on admission matters.[12] Other courts have found a university's broad discretion in admission decisions and also justified nonintervention by analogy to cases involving academic standards.[13] Like the Montana court's stance in *State ex rel. Bartlett v. Pantzer,* 158 Mont. 126, 489 P.2d 375

---

[12]*See Alevy v. Downstate Medical Center,* 39 N.Y.2d 326, 348 N.E.2d 537, 540, 384 N.Y.S.2d 82 (1976).

[13]*See, e.g., State ex rel. Bartlett v. Pantzer,* 158 Mont. 126, 489 P.2d 375 (1971) (analogy to grade case) and *Timmerman v. University of Toledo,* 421 F. Supp. 464 (N.D. Ohio 1976) (there is no reason to distinguish between requirements for entry or completion of study).

In *Bakke,* Mr. Justice Blackmun stressed the universities' expertise and the judiciary's comparatively poor training in admissions in reaching his conclusion that judicial interference must be the exception rather than the rule. *Regents of Univ. of Cal. v. Bakke, supra* at 404 (Blackmun, J.). His statements are consistent with the court's opinion in *Board of Curators v. Horowitz,* 435 U.S. 78, 55 L. Ed. 2d 124, 98 S. Ct. 948 (1978), where the court rejected a procedural due process challenge to an academic dismissal for failure to meet academic standards:

> Like the decision of an individual professor as to the proper grade . . . the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking.

*Board of Curators v. Horowitz, supra* at 90.

(1971), we generally favor nonintervention in admission decisions but nevertheless will continue to review them for arbitrary and capricious action and abuse of discretion.

Finally, McDonald argues that since racially discriminatory criteria are used, the university must demonstrate that the selection process is a valid predictor of the qualities sought (the published criteria) and that these criteria are a valid index to a successful physician. He relies on two cases interpreting Title 7 of the 1964 Civil Rights Act, which are concerned with discriminatory employment tests. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 45 L. Ed. 2d 280, 95 S. Ct. 2362 (1975); *Griggs v. Duke Power Co.,* 401 U.S. 424, 28 L. Ed. 2d 158, 91 S. Ct. 849 (1971). There is no basis for applying these Title 7 cases here. As respondent points out, they are concerned with employment and do not set standards for arbitrary and capricious action in medical school admissions.

McDonald has not shown that the policies and procedures of the University of Washington School of Medicine are arbitrary and capricious. There has not been willful and unreasoning action, without consideration and in disregard of facts or circumstances.

Because McDonald is not entitled to relief, the question of whether the trial court erred in concluding he is not entitled to monetary damages has not been addressed.[14]

The decision of the trial court is affirmed.

UTTER, C.J., BRACHTENBACH, DOLLIVER, HICKS, and WILLIAMS, JJ., and HENRY and RYAN, JJ. Pro Tem., concur.

STAFFORD, J., concurs in the result.

Reconsideration denied October 31, 1979.

---

See also *Wong v. Regents of Univ. of Cal.,* 15 Cal. App. 3d 823, 93 Cal. Rptr. 502 (1971) (court not qualified to pass on attainment of medical student).

[14]In addition, we have not discussed McDonald's claim that the U.W. medical school's national recruitment of minority applicants violates WAC 478–160–125, which before a July 18, 1978, amendment stated the medical school "gives primary preference in admissions" to qualified Washington residents. Finding of fact No. 11, however, states that 120 of 123, or 97.6 percent of the positions available after the WAMI and other special exclusion, were filled by Washington residents.