[No. 47406-1.   En Banc.   May 21, 1981.]

NORTHWEST GILLNETTERS ASSOCIATION, ET AL, *Appellants,* v. GORDON SANDISON, ET AL, *Respondents.*

*Charles E. Yates, Richard M. Slagle,* and *Moriarty, Mikkelborg, Broz, Wells & Fryer,* for appellants.

*Kenneth O. Eikenberry, Attorney General,* and *James M. Johnson, Senior Assistant,* for respondent State of Washington.

*Dave Frohnmayer, Attorney General, Richard David Wasserman, Assistant, John R. McCulloch, Jr., Solicitor General,* and *William F. Gary, Deputy,* for respondent State of Oregon.

UTTER, J.—Northwest Gillnetters Association and other fishing groups sought a declaratory judgment and an injunction against Gordon Sandison, the Washington State

Department of Fisheries, and the States of Washington and Oregon. They seek to have declared as void WAC 220–32–03000U and all other gillnet regulations not adopted for conservation. The Thurston County Superior Court denied their request, and we affirm.

Dismissing the State of Oregon for lack of personal jurisdiction, the Superior Court granted a summary judgment to the State of Washington and its Department of Fisheries. The court upheld the validity of WAC 220–32–03000U and all Washington regulations implementing the Columbia River Compact. WAC 220–32–03000U permitted, in 1980, a 1–day commercial season for the spring chinook salmon of the Columbia River. The 1–day season was declared lawful, though it is undisputed that its purpose was to allocate fish among the recreational and the commercial fishery, its adoption was not strictly necessary to preserve the resource and its effect was to allocate the fish in each state's waters to its own citizens.[1]

Commercial fishing seasons on the Columbia River are annually set by mutual agreement between representatives from Washington and Oregon, pursuant to the Columbia River Compact. Pub. L. No. 123, 40 Stat. 515 (1918). Those representatives met on January 17, 1980, and, after hearing testimony and examining recommendations from their respective fishery departments, agreed to the 1–day season. To effectuate that agreement, WAC 220–32–03000U was passed.

The 1–day limit was the result of a lengthy process of negotiation. Five motions were considered before an agreement occurred. The states considered the expected size of

---

[1]As a result of the 1–day season, commercial fishermen took only 2 percent of the total spring chinook catch. Viewed alone, this statistic suggests an overly solicitous regard for the recreational fishery. Fishery management, however, cannot be viewed in isolated parts. Traditionally, the commercial catch is minimal in the spring and large in the fall. As an example, in 1978, commercial fishermen took approximately 86 percent of the total fall chinook catch. This recurring imbalance is due, in part, to the disposition of chinooks to strike a lure in the spring, and their failure to do so in the fall. Thus, over the course of any year, there is no great disparity between the recreational and the commercial fishery.

the Willamette River run, escapement and conservation needs, and the interests each state has in its sports and commercial fishery. At the hearing, the Oregon Department of Fish and Wildlife staff recommended that there be no winter commercial season in 1980. A staff report indicated that even without a winter commercial season, the smallness of that year's expected run would necessitate restrictions on the recreational fishery. The Washington Department of Fisheries, on the other hand, initially recommended a 2–day commercial fishery. That recommendation was based on its agreement with the Oregon staff reports, the relative stock composition levels that occur in the winter season, and the need to strike a balance between commercial and recreational interests.[2]

### Authority To Manage the Resource

The Washington law governing respondents' authority has a checkered judicial history. A summary of that history, insofar as it relates to the department's authority to allocate salmon among fishermen using different types of gear, is found in *Puget Sound Gillnetters Ass'n v. Moos*, 92 Wn.2d 939, 946–47, 603 P.2d 819 (1979) (*Gillnetters* II). There we stated:

> This court has consistently held that the State Departments of Fisheries and Game can regulate for "conservation only." *Gillnetters, supra* at 681 (Department of Fisheries); *Hartman v. State Game Comm'n*, 85 Wn.2d 176, 532 P.2d 614 (1975) (Department of Game). However, the power to manage a fishery for conservation purposes only is not a restrictive one; it enables the agency to collect data regarding the size, placement, and harvest of runs, to regulate the type of gear and times at which it can be employed in fishing specific varieties and runs of fish, to discriminate among classes of users by gear and purpose, to artificially enhance the fishery

---

[2]The Department of Fisheries had a statutory duty to consider commercial and recreational interests. RCW 75.08.085 permits the director to adopt rules to enhance the recreational fishery. RCW 75.08.012 requires the department "to maintain the economic well–being and stability of the commercial fishing industry . . ."

through hatchery programs, and even to force the owners of existing dams to improve fish passage facilities. *See Department of Fisheries v. Chelan County PUD 1,* 91 Wn.2d 378, 588 P.2d 1146 (1979); *Washington Kelpers Ass'n v. State,* 81 Wn.2d 410, 502 P.2d 1170 (1972); *Frach v. Schoettler,* 46 Wn.2d 281, 280 P.2d 1038 (1955); *McMillan v. Sims,* 132 Wash. 265, 231 P. 943 (1925); *Vail v. Seaborg,* 120 Wash. 126, 207 P. 15 (1922). It has in the past included the power to exclude from state regulation Indians fishing "under federal regulation." *State ex rel. Campbell v. Case* [182 Wash. 334, 47 P.2d 24 (1935)] *supra* at 340–41.

Salmon have been allocated among fishermen using different types of gear ever since it became necessary to manage the resource. We do not agree for the reasons stated below with the assertion of the Puget Sound Gill-netters Association in its brief in opposition to the motion of the State and the Director of Fisheries, that the Department of Fisheries has no statutory authority to participate in allocation. The gillnetters, and their fellow reefnetters, purse seiners and salmon trollers, have all benefited from department regulations limiting the fishing of other user groups to insure each class of fishermen a "share" of the State's salmon resources. . . . *Limiting an agency to conservation regulation has consistently had only one real effect—it prevents the agency from allocating fish among "competing claimants for purposes other than conservation," Gillnetters, supra at 683, i.e., "to any user of the same class." Gillnetters, supra at 692; see also Kelpers, supra at 421–22.*

(Italics ours.)

*Gillnetters* II thus clarified that the Department of Fisheries can allocate among noncompeting users for purposes other than conservation. That conclusion is consistent with our earlier authority, for nonconservation measures have been invalidated only when violative of equal protection. *Gillnetters* II, at 947; *Purse Seine Vessel Owners Ass'n v. Moos,* 88 Wn.2d 799, 810, 567 P.2d 205 (1977). Recognizing this and given the United States Supreme Court's ruling that treaty and nontreaty fishermen are not competing users, we stated:

[A]llocation among treaty and nontreaty fishermen user

classes is necessary to prevent depletion of the resource and to reestablish and "maintain the economic well-being and stability of the commercial fishing industry in the state of Washington." RCW 75.08.012. Regulations necessary to manage the fishery in a manner consistent with implementation of tribal treaty rights can be promulgated by the State of Washington.

*Gillnetters* II, at 949.

█ That mandate to allocate, as well as its rationale, applies with equal force to nontreaty sports and commercial fishermen. The latter, like treaty and nontreaty fishermen, are not competing users within the same class. *See Gillnetters* II, at 947–48; *Purse Seine,* at 810. Appellants' arguments are therefore untenable after *Gillnetters* II.

They are also not sustained by the language of the statutes. The overriding purpose of the statutes is to provide for wise use of the resource, which is the broadest possible definition of conservation. They specifically grant the department the authority to manage, allocate, and perform other necessary functions. RCW 75.08.012, for example, provides:

> It shall be the duty and purpose of the department of fisheries to preserve, protect, perpetuate and manage the food fish and shellfish in the waters of the state and the offshore waters thereof to the end that such food fish and shellfish shall not be taken, possessed, sold or disposed of at such times and in such manner as will impair the supply thereof. For the purpose of conservation, and in a manner consistent therewith, the department shall seek to maintain the economic well-being and stability of the commercial fishing industry in the state of Washington.

While emphasizing the word "conservation," the direction of the last sentence of the statute, to act "[f]or the purpose of conservation, and in a manner consistent therewith" directs the department to engage in other related activities so long as they are consistent with conservation and do not impair the fish supply. These activities, as indicated in the first sentence of the statute, are to "preserve, protect, perpetuate and manage the food fish and shellfish in the waters of the state and the offshore waters . . ."

Other statutes also recognize the department's duty to manage within the parameters of conservation. RCW 75.08.020[3] requires the director to enforce laws and regulations relating to propagation, protection, preservation, and management of the fishery. RCW 75.08.080[4] delineated the scope of the director's power with regard to the time, place, gear and size, sex, numbers and amounts of various classes

---

[3]RCW 75.08.020 provides in part:

"The director shall devote his time to the duties of his office and enforce the laws and regulations of the director relating to propagation, protection, conservation, preservation, and management of food fish and shellfish."

[4]It stated:

"The director shall investigate the habits, supply and economic use of, and classify, the food fish and shellfish in the waters of the state and the offshore waters, and from time to time, make, adopt, amend, and promulgate rules and regulations as follows:

"(1) Specifying the times when the taking of any or all the various classes of food fish and shellfish is lawful or prohibited.

"(2) Specifying and defining the areas, places, and waters in which the taking and possession of the various classes of food fish and shellfish is lawful or prohibited.

"(3) Specifying and defining the types and sizes of gear, appliances, or other means that may be lawfully used in taking the various classes of food fish and shellfish, and specifying the times, places, and manner in which it shall be lawful to possess or use the same.

"(4) Regulating the possession, disposal, and sale of food fish and shellfish within the state, whether acquired within or without the state, and specifying the times when the possession, disposal, or sale of the various species of food fish or shellfish is prohibited.

"(5) Regulating the prevention and suppression of all infectious, contagious, dangerous, and communicable diseases and pests affecting food fish and shellfish.

"(6) The fixing of the size, sex, numbers, and amounts of the various classes of food fish and shellfish that may be taken, possessed, sold, or disposed of.

"(7) Regulating the landing of the various classes of food fish and shellfish or parts thereof within the state.

"(8) Regulating the destruction of predatory seals and sea lions and other predators destructive of food fish or shellfish, and specifying the proof of the destruction of the same that shall be required.

"(9) Specifying the statistical and biological reports that shall be required from licensed or nonlicensed fishermen, dealers, boathouses, handlers, or processors of food fish and shellfish.

"(10) Specifying which species of marine and freshwater life are food fish and shellfish.

"(11) Classifying the species of food fish and shellfish or parts thereof that may be used for purposes other than human consumption.

of food fish and shellfish that may be taken, possessed, sold, or disposed of. RCW 75.08.085[5] empowers the director to promote orderly recreational fisheries and allows him or her to take into consideration factors of navigation, law enforcement, recreational fishery enhancement, environmental concerns and public recreation.

RCW Title 77, while dealing with a different fishery and regulatory scheme, unambiguously identifies the relationship between regulation and conservation. RCW 77.12.010 provides:

> [G]ame fish shall only be taken at such times or places, by such means, in such manner, or in such quantities as will in the judgment of the commission maximize public recreational opportunities but not impair the supply thereof . . .

It provides for regulation in any manner not inconsistent with preservation.

This statutory scheme, as well as *Gillnetters* II, establishes the authority to allocate among noncompeting users, absent some impairment to the resource. And contrary to appellants' position, that authority is not limited by the Columbia River Compact. The compact states:

> "All laws and regulations now existing, or which may be necessary for regulating, protecting, or preserving fish in the waters of the Columbia River, over which the States of Oregon and Washington have concurrent jurisdiction, or any other waters within either of said States, which would affect said concurrent jurisdiction, shall be made, changed, altered, and amended in whole or in part,

---

"(12) Promulgating such other rules and regulations as may be necessary to carry out the provisions of this title and the purposes and duties of the department.

"Subdivisions (1), (2), (3), (4), (6), and (7), shall not apply to licensed oyster farms or oysters produced thereon." RCW 75.08.080.

[5]RCW 75.08.085 provides:

"The director may adopt rules to promote orderly recreational fisheries and may take into consideration factors of navigation, law enforcement, recreational fishery enhancement, environmental concerns, and public recreation. The rules shall be adopted in conformity with chapter 34.04 RCW."

only with the mutual consent and approbation of both States."

40 Stat. at 515 (1918).

■ The United States Supreme Court has interpreted the scope of the compact and, as a result of its interpretation, we have stated that the compact does not prevent either state from adopting regulations

so long as they do not undertake to permit the taking of fish at a time, in a manner, by means of appliances not permissible at the time the compact was made.

*State ex rel. Gile v. Huse,* 183 Wash. 560, 563, 49 P.2d 25 (1935), quoting *P.J. McGowan & Sons, Inc. v. Van Winkle,* 21 F.2d 76, 77 (D. Ore. 1927), *aff'd,* 277 U.S. 574, 72 L. Ed. 995, 48 S. Ct. 435 (1928). *Accord, Olin v. Kitzmiller,* 259 U.S. 260, 66 L. Ed. 930, 42 S. Ct. 510 (1922). The compact therefore prevents the states only from permitting what was otherwise not permissible in 1918, the year in which it was enacted. Allocating among dissimilar users does not fall within that prohibition and consequently, once the representatives agreed on a season, RCW 75.40.020[6] authorized the director to enact all regulations necessary to effectuate it. *See Purse Seine, supra. Purse Seine* indicates that a director must implement, within the limits of statutory authority, the terms agreed to by compact members.

## LEGISLATIVE STANDARDS

Appellants argue that insufficient legislative standards exist to guide the department in exercising its authority and that therefore its actions are arbitrary and capricious and the product of an unlawful delegation of legislative authority. This argument is without merit.

■■ There has been a lawful delegation of authority if

---

[6]RCW 75.40.020 states:

"The director is hereby authorized for and on behalf of the state of Washington to give to the state of Oregon such consent and approbation of the state of Washington as is necessary under and pursuant to the compact entered into between the states of Washington and Oregon, as set out in RCW 75.40.010, to change the open and closed seasons in the Columbia River district as permitted in this chapter."

the legislature has provided general standards which define in general terms what is to be done and who is to do it, and procedural safeguards exist to control arbitrary administrative action. *McDonald v. Hogness,* 92 Wn.2d 431, 598 P.2d 707 (1979); *Barry & Barry, Inc. v. Department of Motor Vehicles,* 81 Wn.2d 155, 500 P.2d 540 (1972). RCW 75.08-.012, .080, and .085 grant the department the power to pass rules and regulations governing by whom, how, and when fish can be taken. They further direct the department to consider the well being of the commercial fishery as well as recreational fishery enhancement. As such, they satisfy the general standards part of the test.

Likewise, an adequate procedural safeguard does exist to control arbitrary administrative action. RCW 34.04.070 provides that the validity of any regulation can be determined by a declaratory judgment action. Since judicial review has been held to constitute a sufficient procedural safeguard, *McDonald,* at 446, there has not been an unlawful delegation of legislative authority.

## PRIVILEGES AND IMMUNITIES

■ Finally, appellants contend the privileges and immunities clause is violated because the regulations resulted in part from an attempt to allocate each state's fishery to its own citizens. That clause is violated when a state discriminates against a noncitizen in a way that frustrates the ability of the nation to operate as a single entity. *Baldwin v. Fish & Game Comm'n,* 436 U.S. 371, 56 L. Ed. 2d 354, 98 S. Ct. 1852 (1978). For such a violation to exist, the discrimination must involve a fundamental right, such as a commercial calling. *Baldwin, supra; Toomer v. Witsell,* 334 U.S. 385, 92 L. Ed. 1460, 68 S. Ct. 1156 (1948).

In this case, the discrimination primarily affects sport fishermen. As between Washington and Oregon commercial fishermen, the regulation has no discriminatory effect. In *Baldwin,* the United States Supreme Court held recreational game hunting did not constitute a right recognized by the privileges and immunities clause. Sport fishing,

under this reasoning, would likewise not be a protected activity.

Moreover, one of the characteristics of a privileges and immunities violation is that it undermines the unity of the country. *Baldwin, supra.* That element is not present in this case in that the challenged regulations were, and will continue to be, the product of a cooperative effort between both states. Given this and that the alleged discrimination could be removed only by eliminating the sports fishery, these regulations do not violate the privileges and immunities clause.

### JURISDICTION

Inasmuch as we conclude the department acted within the authority granted it by the statutes of our state and the compact and no violation of the privileges and immunities clause has occurred, there is no need to discuss whether this court could, for the purposes of this case, have jurisdiction over the State of Oregon.

The Superior Court is therefore affirmed.

BRACHTENBACH, C.J., and ROSELLINI, STAFFORD, DOLLIVER, HICKS, WILLIAMS, DORE, and DIMMICK, JJ., concur.