[No. 21923-9-II. Division Two. September 11, 1998.]

PURSE SEINE VESSEL OWNERS ASSOCIATION, ET AL., *Appellants*, v. THE STATE OF WASHINGTON, *Respondent*.

382

*Robert F. Kehoe* and *Robert P. Zuanich* of *Rigby, Jones & Zuanich*, for appellants.

*Christine O. Gregoire, Attorney General*, and *Fronda C. Woods, Assistant*, for respondent.

HOUGHTON, C.J. — After the Department of Fish and Wildlife failed to allow a certain type of nontreaty herring fishery for conservation reasons, the Purse Seine Vessel Owners Association and other Puget Sound fishers (Purse Seine) filed a lawsuit in superior court, seeking declaratory and injunctive relief against the Department of Fish and Wildlife (Department). The court declined to grant Purse Seine the relief requested. We affirm.

FACTS
History of Spawn-On-Kelp Herring Fisheries

The facts are undisputed. Cherry Point is an area in north Puget Sound near the Canadian border where the state's largest stock of Pacific herring spawns each winter. This geographic area is within one of Washington's marine life reporting areas[1] that is subject to treaties between the United States and American Indian tribes.

During the 1980s, in response to increasing demand in Japan, the Department began developing a type of fishery known as the "spawn-on-kelp" technique. Under this method, egg-laden herring are captured and placed into saltwater net pens filled with kelp. The herring spawn on the kelp, which is then gathered along with the attached roe, cut into pieces, and sold as a delicacy. This method of fishery allows fishers to collect herring roe without killing the fish.

In 1989, the Legislature enacted laws permitting commercial spawn-on-kelp fisheries. The Department awards up to five nontreaty licenses every season to the highest bidders to conduct spawn-on-kelp fisheries. Between 1989

---

[1]Cherry Point is within Marine Fish and Shellfish Catch Management and Reporting Area 20A, and within the case management area established to adjudicate certain rights under treaties between the United States government and Northwest Indian Tribes.

and 1996, the Department awarded between one and four licenses annually.

Each year, the State-Tribal Herring Technical Team predicts the biomass of Puget Sound herring runs, including the Cherry Point run. The spawn-on-kelp fisheries are authorized and opened at Cherry Point only if the biomass of herring exceeds 3,200 tons. Since 1973, the stock of spawning adult herring at Cherry Point has been steadily declining.

At a public hearing held in December 1996, the Department announced that preliminary estimates of the Cherry Point run for the 1997 season indicated that herring stocks would be below or just above the minimum threshold level of 3,200 tons. The Department also stated that it had reached a tentative agreement with three of the four tribes participating in treaty herring fisheries whereby the tribes agreed to forego herring fisheries in 1997 due to the low number of herring returning to Cherry Point. The Department had not reached an agreement with the remaining tribe.

In January 1997, the Department distributed a letter indicating that it would not be authorizing any nontreaty herring spawn-on-kelp fisheries for Cherry Point in 1997 because the biomass of the herring run was too low.[2] The Department reached its decision in the interests of conservation as cautioned by the Herring Technical Team.

In February 1997, the Department announced the opening of two treaty fisheries that permitted two tribes to harvest 22 tons of herring roe from a spawn-on-kelp fishery. Although the Department considered the two tribes' decision unwise, the Department did not attempt to prevent

---

[2]Under RCW 75.08.080(1)(a)-(b), the Department is authorized to specify the time and place for fisheries. But a fishery remains closed unless a Department rule is promulgated to open it because food fish "shall not be fished for except as authorized by rule of the commission." RCW 75.08.011(13).

opening[3] of the fisheries because of the uncertainty of the run size and limited extent of the tribes' harvest.

## The Present Lawsuit and Trial Court's Ruling

Purse Seine filed a lawsuit against the State (acting through the Department) and sought a declaratory judgment and also injunctive relief, alleging that the Department's decision not to close the treaty fisheries while closing the nontreaty fisheries violated RCW 75.56.030, which provides that "[n]o citizen shall be denied equal access to and use of any resource on the basis of race, sex, origin, cultural heritage, or by and through any treaty based upon the same."[4] The matter was tried to the court on affidavits.

The trial court declined to enter a declaratory judgment or grant injunctive relief because the biologists' predictions about the 1997 season fully supported the Department's decision not to open a commercial fishery in the interests of conservation. The trial court ruled that RCW 75.56.030 did not apply, but even if it did, it arguably abrogated treaty rights, and federal law (respecting treaty rights) prevailed under the supremacy clause of the United States Constitution. U.S. Const. art. 6, para. 2. Quoting *Puget Sound Gill-*

---

[3]In order to close a treaty fishery, the state must either convince the federal court's fisheries advisor that closing a tribal fishery is necessary, or ask the federal court for an emergency injunction. *See United v. Washington*, 459 F. Supp. 1020 (1978).

[4] In 1984, the voters approved Initiative 456. It is codified in RCW 75.56.030, and provides in full:

**Management of natural resources—State policy**

The people of the state of Washington declare that conservation, enhancement, and proper utilization of the state's natural resources, including but not limited to lands, waters, timber, fish, and game are responsibilities of the state of Washington and shall remain within the express domain of the state of Washington.

While fully respecting private property rights, all resources in the state's domain shall be managed by the state alone such that conservation, enhancement, and proper utilization are the primary considerations. No citizen shall be denied equal access to and use of any resource on the basis of race, sex, origin, cultural heritage, or by and through any treaty based upon the same.

*netters Ass'n v. Moos,*[5] the court concluded that nontreaty fishers "do not have a 'vested' or 'natural' property right to fish, to take fish, or to fish-taking locations" and that "signatory tribes [have] a right to fish that nontreaty fishermen do not enjoy."

The trial court also deferred to the Department's judgment that the two tribal fisheries would not adversely affect the herring population. In the court's view, this exercise of discretion did not grant nontreaty fishers the legal right to require the Department to authorize fisheries for everyone. Nor did the court agree that the language of RCW 75.56.030 required the Department to authorize nontreaty fisheries once the stock was sufficient to support treaty fisheries. Purse Seine appeals.[6]

## ANALYSIS
### Appellate Jurisdiction

■ ■ As a preliminary matter, the State contends that this court does not have jurisdiction over this appeal because Purse Seine's appeal of the trial court's denial of declaratory relief is interlocutory. The State's assertion is incorrect. A declaratory judgment has the force and effect of a final judgment. *Sorenson v. City of Bellingham*, 80 Wn.2d 547, 496 P.2d 512 (1972); *see also Logan v. North-West Ins. Co.*, 45 Wn. App. 95, 102, 724 P.2d 1059 (1986) (Petrich, J., concurring). Therefore, the trial court's ruling is appealable as a final judgment. *Wooh v. Home Ins. Co.*, 84 Wn. App. 781, 930 P.2d 337 (1997). A judgment is considered final on appeal if it concludes the action by resolving the plaintiff's entitlement to the requested relief. *Reif v. La Follette*, 19 Wn.2d 366, 142 P.2d 1015 (1943).

Here, the trial court entered an order denying Purse Seine's request for declaratory relief. That ruling conclusively adjudged Purse Seine's petition for declaratory relief

---

[5]92 Wn.2d 939, 947-48, 603 P.2d 819 (1979).

[6]At oral argument, counsel for Purse Seine stated that it appeals only the denial of declaratory relief.

by denying the request. That ruling may be appealed as a final judgment. *See* CR 54(a).

## Standard of Review

 Judicial review of an agency (Department) action is governed by the Administrative Procedure Act (APA), RCW 34.05. The party challenging the rule bears the burden of showing that the agency's decision is invalid. RCW 34.05.570(1). Here, the Department's failure to allow nontreaty spawn-on-kelp fishery is an "other agency action" subject to review under RCW 34.05.570(4). On review of an agency decision, this court "sits in the same position as the superior court" and applies the standards of the APA to the record before the agency. *Tapper v. Employment Sec. Dep't*, 122 Wn.2d 397, 402, 858 P.2d 494 (1993) (citations omitted).

Here, there is no agency record because the Department determined not to open the fishery and therefore did not promulgate such a rule.[7] The matter was instead tried to the superior court on affidavits. Thus, we use the rule set forth in *Waste Management of Seattle, Inc. v. Washington Utilities and Transportation Commission*, 123 Wn.2d 621, 633-34, 869 P.2d 1034 (1994), and we review the superior court record because it took additional evidence under RCW 34.05.562 and/or examined an issue not raised before the agency under RCW 34.05.554. Therefore, the information needed for review is contained in the superior court record.

Absent some limited exceptions that are not relevant here, the APA provides the exclusive means and standards for review of the Department's action. RCW 34.05.510; RCW 34.05.570(1)(b); *Neah Bay Chamber of Commerce v. Department of Fisheries*, 119 Wn.2d 464, 468, 832 P.2d 1310 (1992). The agency's action is presumed valid and the party asserting invalidity bears the burden of demonstrating that it is not. RCW 34.05.570(1)(a); *Hillis v. Department of Ecology*, 131 Wn.2d 373, 381, 932 P.2d 139 (1997).

---

[7]*See* note 1, *supra.*

■ Under the APA, the aggrieved party may be granted relief from the agency action when the action is unconstitutional, exceeds the scope of agency authority, or is arbitrary and capricious. RCW 34.05.570(4)(c)(i-iii). For a rule to be arbitrary and capricious, it must be a "willful and unreasoning action, without consideration and in disregard of facts and circumstances." *Heinmiller v. Department of Health*, 127 Wn.2d 595, 609, 903 P.2d 433 (1995), *amended by* 909 P.2d 1294, *cert. denied*, 518 U.S. 1006 (1996) (citations omitted).

### Underlying Department Action

■ Purse Seine first contends that the decision of the lower court is subject to de novo review. Although questions of law are reviewed de novo, "substantial weight is given to the agency's view of the law if it falls within the agency's expertise in that special field of law." *Northwest Steelhead & Salmon Council of Trout Unltd. v. Department of Fisheries*, 78 Wn. App. 778, 786-87, 896 P.2d 1292 (1995) (citations omitted).

Purse Seine asserts that the underlying agency decision was based primarily upon an interpretation of law. This assertion is incorrect. Here, the underlying state action involved the Department's decision not to open nontreaty spawn-on-kelp fisheries for the 1997 season. The Department action was based upon biomass projections by the State-Tribal Herring Technical Team that estimated between 2,474 and 4,705 tons of herring for the 1997 season. This estimation, in turn, was based upon an 80 percent probability. Thus, acting in the interests of conservation, largely based upon the cautioning of the Technical Team, the Department concluded that closing the spawn-on-kelp fisheries for the upcoming season was appropriate. Thus, the agency decision was not primarily based upon an interpretation of law and is not subject to de novo review.

### Treatment of Treaty and Nontreaty Fishers

Purse Seine next contends that the Department should

not be accorded deference because Purse Seine is challenging the breadth of its discretion, not its exercise. That is, Purse Seine argues, the nontreaty closure violates state law and the Department exceeded its authority because RCW 75.56.030 requires that conservation closures be applied equally to treaty and nontreaty fishers.

Moreover, Purse Seine asserts that the Department is required by law to apply the same standard to treaty and nontreaty fishers when closing the fisheries in the interest of conservation, arguing that the Department, in authorizing a treaty fishery while failing to authorize a nontreaty fishery, violated RCW 75.56.030. Purse Seine contends that under this statute,[8] the Department does not have discretion to selectively close the herring spawn-on-kelp fishery to nontreaty fishers for conservation purposes while permitting treaty fisheries to remain open. By failing to exercise its regulatory authority over the treaty tribes while closing the fisheries to nontreaty fishers, Purse Seine contends, is a "patent denial of 'equal access' to the state's fishery resources."

■ Purse Seine's argument is misplaced. Authorizing nontreaty fisheries, but refraining from exercising regulatory authority over treaty fisheries, are two distinct considerations and issues. As the Department notes, there are two different standards. First, under RCW 75.08.012, the Department can *allow* a fishery only if it does not impair the resource. But second, under the *Boldt*[9] decision, the Department can *stop* a treaty fishery only if it *proves*

---

[8]More specifically, Purse Seine asserts that I-456 (codified as RCW 75.56.030) deprives the Department of any discretion in selectively closing the fishery only to nontreaty fishers. According to Purse Seine, the objectives of I-456 were twofold: first, to seek a formal petition to the United States Congress to make steelhead a national game fish and therefore, not subject to commercial sale by the tribes, and secondly, to seek a uniform standard for state regulation of fishing in the interest of conservation. Moreover, Purse Seine asserts that the initiative in no way changed the federally secured treaty rights. Essentially, it argues that nontreaty fishers' 50 percent share of food fish should not be allocated to conservation and preservation of the fishery without the treaty fishers sharing equally in the loss of fishing opportunity.

[9]*United States v. Washington*, 384 F. Supp. 312 (1974) ("Boldt Decision"), *aff'd*, 520 F.2d 676 (9th Cir. 1975), *cert. denied*, 423 U.S. 1086 (1976).

that authorizing the fishery will impair a resource. Thus, it may decide not to allow a nontreaty fishery and, under the same circumstances, not seek to stop a treaty fishery.

*1. State's Broad Powers To Regulate Nontreaty Fisheries*

The fish in the waters of the State belong to all the people of the state in their collective, sovereign capacity. *Marincovich v. Tarabochia*, 114 Wn.2d 271, 276, 787 P.2d 562 (1990); *Moos*, 92 Wn.2d at 948 n.5. And conservation of the state's fish resources has been a priority since statehood. *See* LAWS OF 1889-90, at 106-09, 233-35.

Therefore, in regulating its fish resources, the state, acting through the Department, has broad police powers to manage fish resources within its borders, including the relationship between fish and people. *See, e.g., Douglas v. Seacoast Prods., Inc.*, 431 U.S. 265, 287-88, 97 S. Ct. 1740, 52 L. Ed. 2d 304 (1977) (Rehnquist, J., concurring in part). Unless preempted by federal law, a state's authority over its fisheries is limited only by its own organic law and by the Fourteenth Amendment. *Sohappy v. Smith*, 302 F. Supp. 899, 908 (1969); *Cawsey v. Brickey*, 82 Wash. 653, 656, 144 P. 938 (1914). In Washington specifically, the Department may regulate fish resources with ultimate control as to whether any fish whatsoever may be taken. *Vail v. Seaborg*, 120 Wash. 126, 133, 207 P. 15 (1922).

Pursuant to these broad regulatory powers, the Department has considerable discretion to engage in activities that "preserve, protect, perpetuate and manage the food fish" in the state. RCW 75.08.012; *Northwest Gillnetters Ass'n v. Sandison*, 95 Wn.2d 638, 643, 628 P.2d 800 (1981). The overriding purpose of the statutes is to provide for wise use of the resource. *Id.*

Here, the Department decided not to authorize nontreaty fisheries for the 1997 season in the interests of conservation. This decision was based upon biological data projecting a biomass below the threshold 3,200 tons, or, at best, marginally above that level. The Technical Team advised the Department to use "extreme caution" in authorizing any fisheries for that season. Therefore, the Depart-

ment was acting pursuant to its discretion and broad regulatory authority in preserving the stock of herring. The decision not to authorize the spawn-on-kelp fisheries was undertaken pursuant to its legislative mandate to conserve and protect the fish of the state. This decision was properly taken under the Department's discretion.

*2. State's Limited Regulatory Authority Over Treaty Fisheries*

Relative to its regulatory authority over nontreaty fishers, the state's power over treaty fishers is more limited. As the Supreme Court of the United States has held, treaties preempt the state's ability to regulate signatory tribal fishing except in limited circumstances. *Tulee v. Washington*, 315 U.S. 681, 684, 62 S. Ct. 862, 86 L. Ed. 2d 1115 (1942); *Puyallup Tribe v. Department of Game*, 391 U.S. 392, 398-99, 88 S. Ct. 1725, 20 L. Ed. 2d 689 (1968). Accordingly, treaty tribes generally regulate their own fisheries. *Puget Sound Gillnetters Ass'n v. United States Dist. Ct.*, 573 F.2d 1123, 1128 (9th Cir. 1978), *vacated on other grounds*, 443 U.S. 658 (1979).

Thus, federal treaty rights for taking fish preempt state authority except where necessary for conservation. *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 682, 99 S. Ct. 3055, 61 L. Ed. 2d 823 (1979); *Puyallup Tribe*, 391 U.S. at 398-99. We note that several federal courts have enjoined state regulation of treaty fishing where the regulation was not "essential" to conservation. *See, e.g., United States v. Washington*, 384 F. Supp. 312, 402 (1974); *Hoh Indian Tribe v. Baldridge*, 522 F. Supp. 683, 691-92 and n.1 (1981). Wise use of the resource alone is not a basis for state regulation of treaty fishing. *United States v. Washington*, 384 F. Supp. at 402.

Moreover, a state may regulate treaty fishing only after it has proved that is unable to preserve the resource by forbidding fishing by nontreaty fishers. *See United States v. Washington*, 384 F. Supp. at 342, 520 F.2d at 686-87. That is, only after a state has closed nontreaty fisheries can it seek regulation of treaty fishing by seeking an injunc-

tion in federal court. *United States v. Washington*, 459 F. Supp. 1061, 1062-63 (1976). In the words of one court, the state must prove that closing its fisheries for conservation is "required for the perpetuation of a species." *State v. Miller*, 102 Wn.2d 678, 688, 689 P.2d 81 (1984); *see also State v. Reed*, 92 Wn.2d 271, 274-75, 595 P.2d 916, *cert. denied*, 444 U.S. 930 (1979).

Clearly, then, the state is more limited in regulating treaty fisheries as compared with its authority over nontreaty fisheries. And the action taken in determining whether to close treaty fisheries is different. The state must first prove that conservation could not be accomplished by limiting nontreaty fisheries, and then it must convince the federal court that conservation is necessary. Only then, is the State able to close a treaty fishery. *United States v. Washington*, 520 F.2d at 686-87.

*3. Commercial Fishing Interests Must Yield to Conservation*

 Purse Seine further asserts that RCW 75.08.012[10] places an affirmative, nondiscretionary duty upon the Department to allocate up to 50 percent of the harvestable herring to nontreaty fishers. We disagree. It is well settled that the taking of fish is not a vested or natural property right, *Moos*, 92 Wn.2d at 947-48; *Neah Bay*, 119 Wn.2d at 476; *Marincovich*, 114 Wn.2d at 276. To the contrary, harvesting fish is a privilege bestowed by the state, that is, the "citizen's right to take fish is purely derivative of the state's power to regulate rights in the fish." *Puget Sound Gillnetters Ass'n v. United States Dist. Ct.*, 573 F.2d at 1132.

Thus, although nontreaty fishers may be entitled to their

---

[10]**Mandate of the Department** [Fish and Wildlife]

The department shall preserve, protect, perpetuate and manage the food fish and shellfish in state waters and offshore waters.

The department shall conserve the food fish and shellfish resources in a manner that does not impair the resource. In a manner consistent with this goal, the department shall seek to maintain the economic well-being and stability of the fishing industry in the state. The department shall promote orderly fisheries and shall enhance and improve recreational and commercial fishing in this state.

fair share of harvestable fish, state conservation interests are paramount, and the Department has an obligation to ensure the continued viability of the state's fishery resources. The conservation of the state's fish resources must remain paramount to the commercial interests of non-treaty fishers. As the trial court properly noted, a court should be leery of trying to substitute its judgment for that of the agency empowered to control one of the state's precious marine resources.

Affirmed.

MORGAN and BRIDGEWATER, JJ., concur.

Review denied at 137 Wn.2d 1030 (1999).