IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| SEATTLE HISTORIC WATERFRONT ASSOCIATION, and MADISON TOWER CONDOMINIUM ASSOCIATION, | )<br>)<br>)<br>)<br>) | No. 39610-0-III |
| Appellants, | )<br>) | |
| | ) | UNPUBLISHED OPINION |
| v. | )<br>) | |
| AMLI RESIDENTIAL, WOLDSON ALASKAN WAY 01, LLC, WOLDSON WESTERN 01, LLC and CITY OF SEATTLE, | )<br>)<br>)<br>)<br>) | |
| | ) | |
| Respondents. | ) | |

COONEY, J. — Seattle Historic Waterfront Association and Madison Tower

Condominium Association (collectively "Historic Waterfront"), filed a petition under the

Land Use Petition Act (LUPA), chapter 36.70C RCW, challenging the approval of a

master use permit (MUP) issued by the Seattle Department of Construction and

Inspections (SDCI) to AMLI Residential[1] (AMLI) for the development of a 17-story,

245-unit apartment building (Project) located near Seattle's downtown waterfront.

---

[1] The respondents, AMLI Residential, Woldson Alaskan Way 01, LLC, Woldson Western 01, LLC, and the City of Seattle are collectively referred to as "AMLI."

No. 39610-0-III
*Seattle Historic Waterfront Ass'n, et al. v. AMLI Residential, et al.*

On appeal, Historic Waterfront assigns error to the superior court's order dismissing its shoreline permitting issues, denying its motion to allow additional discovery and to supplement the record, and affirming the city of Seattle's Office of the Hearing Examiner's (Examiner) decision approving the design review.

We affirm.

BACKGROUND

In 2014, Gonzaga University acquired real property located between Alaskan Way and Western Avenue and Spring Street and Seneca Streets in the city of Seattle (City). The property is owned by Woldson Alaska, LLC, and Woldson Western, LLC, which are wholly owned subsidiaries of Gonzaga University. The western 32 feet of the property is located within 200 feet of the Alaskan Way seawall, subjecting it to the Shoreline Management Act of 1971 (SMA), chapter 90.58 RCW, and the City's Shoreline Master Program (SMP), chapter 23.60A Seattle Municipal Code (SMC).

In 2019, Gonzaga University obtained a lot boundary adjustment that divided the property into four lots (hereinafter lots A, B, C, and D). Lots C and D are located within 200 feet of the Alaskan Way seawall. Lots A and B are situated beyond 200 feet from the Alaskan Way seawall. AMLI leased lots A and B from Woldson Alaska, LLC, with the intent of constructing a 17-story, 245-unit apartment building with retail and commercial space and parking for over 150 vehicles.

2

Before AMLI could make application for a MUP, the Project had to be reviewed by the City's Design Review Board (DRB) under the Downtown Design Guidelines (Guidelines). At the first Early Design Guidance (EDG) meeting, held on March 19, 2019, architect Jon Hall discussed the applicable guidelines, zoning patterns, how the proposed design of the building fit with the surrounding area, and provided the DRB with design options that adhered to the Guideline's massing requirements.

At a second EDG meeting, held on July 9, Mr. Hall proposed alternative design options in response to massing concerns that were raised by the DRB at the first meeting. Both EDG meetings allowed for public comment. Eventually, the DRB voted for the Project to advance to the recommendation stage of design review.

On September 6, AMLI applied for an MUP. The application contained revised plans that addressed design concerns raised by the DRB at the earlier EDG meetings. On September 19, the SDCI entered notice of AMLI's application into the public record. The notice provided that the SDCI was not requiring AMLI to undergo shoreline permitting.

In an initial administrative recommendation, dated June 18, 2020, SDCI Senior Land Use Planner Joseph Hurley recommended the Project comply with additional design requirements before the MUP be issued. A follow-up design recommendation meeting was held before the DRB on November 17. At the meeting, Mr. Hall addressed

3

the concerns raised by Mr. Hurley by setting back and extending the façade of the south tower, extending the south tower's roofline, and recessing the entryway and extending its canopy.

The DRB concluded that, with the inclusion of proposed changes, the Project complied with the Guidelines. However, the DRB recommended several options to better meet Guidelines A-2 and B-4. Design approval and issuance of the MUP were conditioned on these issues being resolved. Previous comments concerning Guidelines B-2 and B-3 were not included in the DRB's priorities and recommendation.

AMLI adjusted the design of the Project to address the DRB's priorities and recommendations. Following the adjustments, on April 29, 2021, the SDCI issued AMLI its MUP. In its decision, the SDCI concluded the Project incorporated the DRB's recommended conditions and complied with all design guidelines, laws, and permits.

APPEAL TO THE HEARING EXAMINER

On May 12, Historic Waterfront filed a notice of appeal to the Hearing Examiner. Historic Waterfront claimed the SDCI issued the MUP even though the Project failed to meet numerous Guidelines, including A-1, A-2, B-1, B-2, B-3, and B-4. On the same date, Historic Waterfront requested a land use interpretation from the SDCI Director (Director) regarding the applicability, or lack thereof, of the SMP to the Project.

4

On June 11, the Director responded to Historic Waterfront's land use interpretation request. The Director concluded the matter was not subject to interpretation because Historic Waterfront had "not identified any section of the code applicable to the subject site." Administrative Record (AR) at 91. In light of the Director's decision to not issue an interpretation, the Examiner dismissed Historic Waterfront's SMP appeal. On August 16, the Examiner conducted a one-day appeal hearing. At the hearing, AMLI presented the testimony of Mr. Hall, the City presented the testimony of Mr. Hurley, and Historic Waterfront presented the testimony of architect John Adams.

Mr. Hall testified that AMLI had made several adjustments to the overall design to account for the concerns flagged by the DRB, such as adjusting the heights, massing, and setbacks of the north and south towers, and adjusting the façade by the color of the glass, the color of the mullions, and the color of raised metal panels. Mr. Hall testified that through the evolution of the design review process, the Project gained compliance with the Guidelines. Mr. Hurley testified about the design review process and that the Project met the Guidelines.

Mr. Adams testified that the Project lacked the "distinctive pallet of materials" necessary to enhance the City's skyline. Clerk's Papers (CP) at 404. Mr. Adams noted the Guideline's use of the Watermark Tower as an example of a building that truly

enhanced the City's skyline. He testified that the addition of a dark stripe at the top of the tower was insufficient to make the tower distinctive. Mr. Hall responded that the Watermark Tower was only one example and "plenty of other examples of more modern buildings than—than these, which use different elements to articulate the roofline and provide that interest that the—the guidelines have in mind." *Id.*

After considering the testimony of the witnesses and the entire record, on September 24, the Examiner issued a decision. In part, the Examiner concluded:

> 3. The question before the Hearing Examiner is not whether alternative project designs would be preferable or are more aesthetically pleasing within the subjective view of an Appellant (or the Examiner); it is whether the City erred in approving the design review for the Project. In addition, where, as here, legal argument presented by the Appellants is largely limited to generalized references to testimony from its witness Mr. Adams, and conclusory statements about the Project design with no reference to the record, the Appellants cannot adequately meet their burden of proof.

AR at 252. The Examiner concluded that "the Director's design review Decision was not shown to be clearly erroneous" and affirmed the Director's design review decision. *Id.*

APPEAL TO THE SUPERIOR COURT

Historic Waterfront appealed the Examiner's decision to the superior court under the LUPA and moved the court for an order authorizing limited discovery and allowing supplementation of the record regarding its SMP issue. In response, AMLI moved for partial summary judgment or, alternatively, summary judgment on the SMP and Guideline claims.

6

The superior court granted the motion for partial summary judgment, concluding that Historic Waterfront's SMP issue was time barred under the LUPA because it was not filed within 21 days of the final land use decision. Since the SMP issue was time barred, the court denied Historic Waterfront's motion for limited discovery and for supplementation of the record. The court then examined the remaining LUPA claims by reviewing the entire record pursuant to RCW 36.70C.110. Ultimately, the court concluded that Historic Waterfront had failed to satisfy its burden under RCW 36.70C.130(1) and denied the LUPA petition.

Historic Waterfront appeals.

## ANALYSIS

On appeal Historic Waterfront assigns error to the superior court's order dismissing its SMP issues, denying its motion to allow for additional discovery and to supplement the record, and affirming the decision that approved the design review.

### I. APPEAL OF SHORELINE PERMITTING ISSUE

Historic Waterfront argues that the superior court erred in dismissing the SMP issue as untimely—that, under RCW 36.70C.040, it had 21 days from the Examiner's decision (September 24, 2021) to file its appeal of the SMP issue. We disagree. The SMP issue was not properly before the Examiner. Under the LUPA, the SDCI's decision

7

on the SMP became a final land use determination prior to the Examiner issuing his decision.

The superior court's dismissal of the SMP issue represents a legal conclusion. We review legal conclusions de novo. *See Birgen v. Dep't of Lab. & Indus.*, 186 Wn. App. 851, 856, 347 P.3d 503 (2015); *Nickum v. City of Bainbridge Island*, 153 Wn. App. 366, 374, 223 P.3d 1172 (2009).

The LUPA was enacted to ensure timely judicial review of land use decisions and to prevent parties from delaying judicial review following the administrative process of a local jurisdiction. *Habitat Watch v. Skagit County*, 155 Wn.2d 397, 406, 120 P.3d 56 (2005); RCW 36.70C.010. The LUPA requires that challenges to a land use decision be filed with the superior court within 21 days of the decision. RCW 36.70C.040(3). In accordance with the LUPA's purpose, courts have applied a strict adherence to its 21-day filing period. *Durland v. San Juan County*, 182 Wn.2d 55, 67, 340 P.3d 191 (2014). Failure to follow the 21-day filing period mandates a holding of untimeliness and makes the land use decision unreviewable by the courts. *Id.* at 67-68 n.7; *Habitat Watch*, 155 Wn.2d at 407.

For a superior court to acquire authority over a LUPA petition, the land use decision must be from a final decision from a local jurisdiction. *Chelan County v. Nykreim*, 146 Wn.2d 904, 938, 52 P.3d 1 (2002). A land use decision is "a final

8

determination by a local jurisdiction's body or officer with the highest level of authority to make the determination" on an "application for a project permit or other government approval required by law before [a] property may be . . . developed." RCW 36.70C.020(2). Finality is necessary because "[i]f there was not finality, no . . . land owner would ever be safe in proceeding with the development of his [or her] property." *Samuel's Furniture, Inc. v. Dep't of Ecology*, 147 Wn.2d 440, 458, 54 P.3d 1194, 63 P.3d 764 (2002) (first alteration in original).

A decision is "final" if it "'leaves nothing open to further dispute and which sets at rest the cause of action between the parties.'" *Id*. at 452 (quoting BLACK'S LAW DICTIONARY 567 (5th ed. 1979)). A judgment shall be "'considered final on appeal if it concludes the action by resolving the plaintiff's entitlement to requested relief.'" *Id*. (quoting *Purse Seine Vessel Owners Ass'n v. State*, 92 Wn. App. 381, 387, 966 P.2d 928 (1998)). By contrast, an interlocutory decision is "'intervening between the commencement and the end of a suit which decides some point or matter, but is not a final decision of the whole controversy.'" *Id*. (quoting BLACK'S, *supra*, at 731).

A MUP is "the document issued to an applicant that records all land use decisions that are made by the Department on a master use application." SMC 23.84A.025. To be issued a MUP, the applicant is required to submit a master use permit application to the SDCI Director. SMC 23.76.010.A.1, .010.B. The Director then notifies the applicant

9

within 28 days if the application is complete or if additional information is required. SMC 23.76.010.E.1.

The SMC divides land use decisions into five categories, only two of which are relevant to this appeal. "Procedures for the five different categories are distinguished according to who makes the decision, the type and amount of public notice required, and whether appeal opportunities are provided." SMC 23.76.004.A. Of the five categories, only Type I and Type II decisions are consolidated within an MUP. SMC 23.76.004.B.

Type I decisions include development standards not otherwise designated as Types II, III, IV, or V. SMC 23.76.004, Table A. Type I decisions are issued "at the time of the Director's decision that the [permit] conforms with all applicable laws." SMC 23.76.028.B. The Director is not required to provide notice of Type I decisions. SMC 23.76.020.C.1. "Type I decisions are decisions made by the Director [and] are not appealable to the Hearing Examiner." SMC 23.76.004.B. However, a "Type I decision[ ] may be subject to administrative review through a land use interpretation pursuant to [SMC] 23.88.020." SMC 23.76.022.A.1. The parties agree that the applicability of the SMP is a Type I decision. Br. of Appellants Historic Waterfront Ass'n & Madison Tower Condo. Ass'n at 13; Resp. Br. of Resp'ts City of Seattle & AMLI Residential at 2; Br of Resp'ts Woldson Alaskan Way 01, LLC & Woldson Western 01, LLC at 6-8.

10

No. 39610-0-III
*Seattle Historic Waterfront Ass'n, et al. v. AMLI Residential, et al.*

Type II decisions are larger "discretionary decisions" that require public notice

and comment. SMC 23.76.004.B; 23.76.012.A.2. Design decisions are classified as

Type II under SMC 22.76.004, Table A. When the Director issues a decision on an

MUP, notice of all Type II decisions must be provided by:

a. Inclusion in the Land Use Information Bulletin;
b. Publication in the City official newspaper;
c. Notice provided to the applicant and to persons who provided an
   address for notice and either submitted written comments on the
   application, or made a written request for notice; and
d. Filing of DNSs with the SEPA Public Information Center and
   distribution of DNSs as required by Section 25.05.340; and
e. Filing of any shoreline decision in a Master Use Permit with
   the Department of Ecology according to the requirements in
   WAC 173-27-130.

SMC 23.76.020.C.2. The notice shall contain "the nature of the applicant's proposal,

a description sufficient to locate the property, and the decision of the Director."

SMC 23.76.020.D. Type II decisions are subject to review by the Examiner. SMC

23.76.022.C.

A land use interpretation is "[a] decision by the Director as to the meaning,

application, or intent of any development regulation in Title 23 [SMC] . . . as it relates to

a specific property or decision by the Director." SMC 23.88.020.A. An interpretation

arms the Director with the authority to "affirm, reverse, or modify all or any portion of a

Type I or Type II land use decision." *Id.* Should the Director decide that an issue is not

subject to an interpretation, the Director's decision is "final and not subject to

11

administrative appeal." *Id.* However, interpretation requests "are not administrative remedies that must be exhausted before judicial review of a decision." *Id.*

An interpretation request that relates to a project application that requires no public notice must be filed within 14 days after the MUP application is deemed complete. SMC 23.88.020.C.2.a. If an interpretation request involves a Type I decision and a Type II decision, the request may combine the Type I request with the Type II request. SMC 23.88.020.C.3.c. However, the requester must state "with specificity: 1) How the Director's construction or application of the specified code sections is in error; and 2) How the requester believes those sections should be construed or applied." *Id.*

On May 12, 2021, Historic Waterfront filed its appeal with the Examiner. Historic Waterfront appealed "the April 29, 2021 decision to approve the Master Use Permit application" and the "forthcoming code interpretation that has been requested from the Director." AR at 4. On the same day, Historic Waterfront also made an interpretation request to the Director. On June 11, the Director found that Historic Waterfront had failed to specify which provision of chapter 23 SMC or chapter 25 SMC it sought an interpretation of and denied the interpretation request.

An interpretation request is not required before judicial review of the Director's decision becomes available. SMC 23.88.020.A. However, should the Director issue an interpretation related to a Type I decision, then the Director's interpretation may be

12

appealed to the Examiner along with any Type II decisions. *Id.* Accordingly, if the Director refuses to issue an interpretation then that decision is final and unappealable to the Examiner. SMC 23.88.020.A. On June 11, the Director declined to issue Historic Waterfront's Type I interpretation request. Therefore, the Type I decision was not subject to review by the Examiner.

In promoting a single review process before the Examiner, Historic Waterfront contends that all land use issues, including whether permitting is required, fall under the MUP. Historic Waterfront argues that requiring Type I decisions to be immediately appealable under the LUPA would inundate the courts with appeals. Historic Waterfront advocates for the LUPA's 21-day appeal period to apply to all permitting issues and to commence upon entry of the Examiner's decision.

Although a single review process may prevent piecemeal litigation, such a holding would run contrary to the LUPA's and the SMC's expedited review. SMC 23.76.002; *Habitat Watch*, 155 Wn.2d at 406-07. A stated purpose of chapter 23.76 SMC is to "minimize delays and expense in appeals of land use decisions." SMC 23.76.002. Similarly, the LUPA was enacted, in part, to ensure timely judicial review and "to prevent parties from delaying judicial review." *Habitat Watch*, 155 Wn.2d at 406.

Under the LUPA, a land use decision is issued by either "a local jurisdiction's body *or* officer with the highest level of authority to make the determination." RCW

13

36.70C.020(2) (emphasis added). RCW 36.70C.020(2) extends the definition of "final determination" to those with authority to hear appeals. SMC 23.76.004.B is rigid, preventing Type I decisions made by the Director from being subject to appeal to the Examiner. Absent the issuance of an interpretation by the Director, the Examiner lacked jurisdiction over the Type I decision. Consequently, the Director was the officer with the highest level of authority to make the Type I decision.

On June 3, 2022, nearly three years after the SDCI's decision that the Project was not subject to shoreline permitting, the superior court dismissed Historic Waterfront's LUPA petition related to the SMP issue. Seeking judicial review of a Type I decision years after the SDCI's decision is contrary to chapter 36.70C RCW's and chapter 23.76 SMC's directive to minimize delay.

On April 29, 2021, the SDCI issued AMLI its MUP, again providing notice that the Project was not subject to the SMP. The MUP prompted Historic Waterfront to request an interpretation from the Director. On June 11, the Director declined Historic Waterfront's interpretation request due to its failure to comply with SMC 23.88.020.A. Because the Director refrained from issuing an interpretation, the Type I decision was final as it was not subject to administrative appeal.

On September 24, the Examiner issued his decision upholding the Director's issuance of the MUP. The only issue before the Examiner was the Director's decision on

14

the design review.  Historic Waterfront filed its LUPA petition on October 13, within 21 days of the Examiner's decision upholding the issuance of the Director's approval of the design review.  However, the petition was filed more than 21 days after the SDCI's decision on the SMP (September 19, 2019), the Director's issuance of the MUP (April 29, 2021), and the Director's declination of the interpretation request (June 11, 2021).

Although Historic Waterfront timely filed its LUPA petition in relation to the Examiner's decision, its petition for review of the Type I decision was untimely.

II.   DISCOVERY AND SUPPLEMENTATION OF THE RECORD

Historic Waterfront argues that, if we reverse the superior court's order that dismissed its SMP issue, we should grant it the opportunity to engage in further discovery and to supplement the record.

The superior court denied Historic Waterfront's motion to allow further discovery and to supplement the record, finding the issue was moot.  An issue is moot when a court can no longer provide effective relief.  *In re Marriage of Homer*, 151 Wn.2d 884, 891, 93 P.3d 124 (2004) (citing *Orwick v. City of Seattle*, 103 Wn.2d 249, 253, 692 P.2d 793 (1984)).  Customarily, an appeal should be dismissed "'where only moot questions or abstract propositions are involved.'"  *In re Dependency of H.*, 71 Wn. App. 524, 527, 859

P.2d 1258 (1993) (quoting *Sorenson v. City of Bellingham*, 80 Wn.2d 547, 558, 496 P.2d 512 (1972)).

Because Historic Waterfront's appeal of its SMP issue was untimely, as discussed above, allowing further discovery and supplementation of the record are rendered moot.

REQUEST FOR REMAND FOR A LAND USE INTERPRETATION

Alternatively, Historic Waterfront argues the SMP issue be remanded to the Director with instructions to issue an interpretation. This contention is grounded in Historic Waterfront's assertion that the Director erred in failing to issue an interpretation.

The LUPA permits review of land use decisions. *Durland*, 182 Wn.2d at 64. Under RCW 36.70C.020(2)(b), a land use decision shall include a final determination by a local jurisdictional body or the highest level officer capable of making decisions on decisions such as an interpretative decision regarding specific development of a property. Absent an avenue of administrative appeal, the highest level official's decision is a final determination subject to review under the LUPA.

The Director was the local jurisdictional body capable of issuing an interpretation. Historic Waterfront filed its LUPA petition challenging his decision on October 12, 2021, more than 21 days after the Director's decision. As discussed above, Historic Waterfront failed to timely appeal the Type I decision.

16

Historic Waterfront argues the Examiner's decision on design review must be reversed because the Examiner failed to enter adequate findings to support his decision, applied the incorrect standard of review, misapplied the clearly erroneous standard of review, and because the Project's design lacks compliance with the Guidelines. We address each contention in turn.

III.    DESIGN REVIEW GUIDELINES

When reviewing a LUPA petition, this court sits in the same position as the superior court. *Ellensburg Cement Prod., Inc. v. Kittitas County*, 179 Wn.2d 737, 742, 317 P.3d 1037 (2014). "Under LUPA a court may grant relief from a local land use decision only if the party seeking relief has carried the burden of establishing that one of six standards listed in RCW 36.70C.130(1) has been met." *Wenatchee Sportsmen Ass'n v. Chelan County*, 141 Wn.2d 169, 175, 4 P.3d 123 (2000). Historic Waterfront seeks relief under RCW 36.70C.130(1)(b), (c), and (d) without referencing the standard of review that ought to be applied to the various design review issues.

RCW 36.70C.130(1)(b) allows relief if "[t]he land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise." The erroneous interpretation standard is a question of law reviewed de novo. *Phoenix Dev., Inc. v. City of Woodinville*, 171 Wn.2d 820, 828, 256 P.3d 1150 (2011). Under the statute, deference is owed to the local entity's

expertise. *Ellensburg Cement Prod.*, 179 Wn.2d at 753. However, "a local entity's interpretation of an ambiguous local [statute] may be rejected." *Id.* A local entity "'bears the burden to show its interpretation was a matter of preexisting policy.'" *Id.* (quoting *Sleasman v. City of Lacey*, 159 Wn.2d 639, 647, 151 P.3d 990 (2007)).

RCW 36.70C.130(1)(c) allows relief if "[t]he land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court." Under the substantial evidence standard there must be a "sufficient quantum of evidence in the record to persuade a reasonable person that the declared premise is true." *Wenatchee Sportsmen Ass'n*, 141 Wn.2d at 176 (citing *Wilson v. Emp. Sec. Dep't*, 87 Wn. App. 197, 200-01, 940 P.2d 269 (1997)). "When reviewing a challenge . . . under subsection (c), we view facts and inferences in the light most favorable to the party that prevailed in the highest forum exercising fact-finding authority." *Phoenix Dev.*, 171 Wn.2d at 828-29.

RCW 36.70C.130(1)(d) allows relief if "the land use decision is a clearly erroneous application of the law to the facts." If, after applying the facts to the law, the court is left with a definite firm conviction that a mistake has been committed then reversal is permitted. *Cingular Wireless, LLC v. Thurston County*, 131 Wn. App. 756, 768, 129 P.3d 300 (2006). When applying the facts to the law, we defer to factual determinations made by the highest forum below that exercised fact-finding authority. *Id.*

18

A.  ADEQUACY OF THE EXAMINER'S FINDINGS OF FACT

Historic Waterfront argues the Examiner failed to enter findings adequate to support his decision.  Without adequate findings, Historic Waterfront claims this court is unable to determine the basis on which the Examiner decided the issues.

Historic Waterfront cites *Weyerhaeuser v. Pierce County*, 124 Wn.2d 26, 873 P.2d 498 (1994), and *In re Welfare of Woods*, 20 Wn. App. 515, 581 P.2d 587 (1978), to support its contention that the Examiner was required to enter findings delineating what aspects of each witness's testimony he found persuasive and why.  In part, the *Weyerhaeuser* court held that the purpose of entering adequate findings is to allow the appellate court to be fully informed as to the basis for the decision-maker's conclusions. *Weyerhaeuser*, 124 Wn.2d at 35.  Similarly, the *Woods* court held that adequate findings are necessary for judicial review.  *Woods*, 20 Wn. App. at 516.  However, neither *Weyerhaeuser* nor *Woods* specifically held that the trier of fact was required to explicitly state what aspect of one witness's testimony it found more credible than a competing witness's testimony.

Unlike the Examiner's findings of fact, in *Weyerhaeuser* the hearing examiner's findings were insufficient to explain how he reached his conclusions.  *Weyerhaeuser*, 124 Wn.2d at 36.  As later noted by our Supreme Court, "*Weyerhaeuser* was an extreme case of noncompliance."  *Citizens All. to Protect Our Wetlands v. City of Auburn*, 126 Wn.2d

19

356, 369, 894 P.2d 1300 (1995). By contrast, when a decision-maker's findings provide an analysis on each issue, the findings of fact and conclusions of law are sufficient for appellate review. *Id.*

Historic Waterfront lacks authority supporting its assertion that the Examiner was required to articulate the basis for finding the testimony of one expert witness more persuasive than another's. Moreover, "[w]e defer to the hearing examiner's assessment of the 'credibility of witnesses and the weight to be given reasonable but competing inferences.'" *Friends of Cedar Park Neigh. v. City of Seattle*, 156 Wn. App. 633, 641-42, 234 P.3d 214 (2010) (quoting *State ex rel. Lige & Wm. B. Dickson Co. v. Pierce County*, 65 Wn. App. 614, 618, 829 P.2d 217 (1992)). Consequently, the Examiner possessed the latitude to decide the persuasiveness of Mr. Adams's testimony against Mr. Hall's and Mr. Hurley's testimony.

The record sufficiently enables us to determine the basis on which the Examiner entered his findings of fact and conclusions of law. The Examiner issued a seven-page, single-spaced decision. In his decision, the Examiner recognized that the party appealing the Director's determination had the burden of proving the determination was clearly erroneous. The Examiner noted the question before him was "not whether alternative project designs would be preferable or are more aesthetically pleasing; . . . it is whether the City erred in approving the design review for the Project." AR at 252. The Examiner

explained that competing opinions from different professionals do not amount to affirmative evidence of error and that Historic Waterfront had failed to meet its burden of demonstrating that the Project lacked fulfillment to the challenged Guidelines.

B.  THE EXAMINER APPLIED THE CORRECT STANDARD OF REVIEW

Historic Waterfront asserts the Examiner incorrectly applied the clearly erroneous standard of review rather than de novo review.  Historic Waterfront contends that even under the clearly erroneous standard, the Examiner failed to consider the entire record and the public policy underlying the legislation.

Historic Waterfront's argument fails to recognize the difference between scope of review and standard of review.  SMC 23.76.022.C.6 provides, "Scope of Review. Appeals [for Type II decisions] shall be considered de novo."  SMC 23.76.022.C.7 states, "Standard of Review.  The Director's decisions made on a Type II Master Use Permit shall be given substantial weight, except for determinations on variances, conditional uses, and special exceptions, which shall be given no deference."

Frequently, "scope of review" and "standard of review" are used as synonyms, but each possesses its own definition.  "Scope of review" generally means the scope of evidence that can be considered while "standard of review" describes the "intensity of review applied to [the] decision."  *Port of Seattle v. Pollution Control Hr'gs Bd.*, 151 Wn.2d 568, 595 n.7, 90 P.3d 659 (2004).

21

While the SMC is clear that the scope of review (the evidence a hearing examiner had the power to consider) was de novo, the question of what standard of review to apply lingers. SMC 23.76.022.C.7 requires a hearing examiner give substantial weight to the director's decisions. In *Norway Hill*, our Supreme Court held that the clearly erroneous standard would allow a reviewing court to give substantial weight to an agency decision, while allowing a reviewing court to still consider the public policy behind the legislative act at issue. 87 Wn.2d 267, 275, 552 P.2d 674 (1976).

Historic Waterfront contends *Norway Hill* should not be read to equate substantial weight with the clearly erroneous standard, but rather it should be read to view substantial weight in the context of a larger assessment of whether the decision was clearly erroneous. Historic Waterfront relies on *Moss v. City of Bellingham*, 109 Wn. App. 6, 19, 31 P.3d 703 (2001), to support its interpretation of *Norway Hill*. However, *Moss* does not stand for the proposition that substantial weight does not equate to the clearly erroneous standard of review. Rather, the issue in *Moss* was whether an environmental impact survey was necessary. The *Moss* court recognized the clearly erroneous standard was appropriate for review because it provides substantial weight to the agency decision. *Id.* The substantial weight requirement under *Norway Hill* compels us to review SDCI's decision under the clearly erroneous standard. *Clallam County*

*Citizens for Safe Drinking Water v. City of Port Angeles*, 137 Wn. App. 214, 224-25, 151 P.3d 1079 (2007).

The public policy of design review is to "[e]ncourage better design and site planning to help ensure that new development enhances the character of the city and sensitively fits into the neighborhoods, while allowing for diversity and creativity." SMC 23.41.002.A. The Examiner acknowledged this public policy when discussing the applicable law in his findings. Further, the Examiner found that the DRB considered the policy issues, recommended the Project be approved, and the Director approved the Project based on this recommendation. The Examiner gave proper deference to the Director's decision when he found that Historic Waterfront offered no affirmative evidence showing error on the part of the Director.

SMC 23.76.022.C.7's directive that substantial weight be given to the Director's decision indicates that the standard of review is the clearly erroneous standard. The Examiner applied the correct standard of review when he considered the entirety of the record and the public policy underlying the legislative act before concluding that the Director's decision was not clearly erroneous.

C. THE EXAMINER'S DECISION COMPLIES WITH THE DESIGN GUIDELINES

Historic Waterfront contends the Examiner's decision on design review should be reversed because the Project's design lacks compliance with Guidelines A-2, B-2, B-3,

23

and B-4. As it relates to each of the challenged Guidelines, Historic Waterfront argues the Examiner's findings do not support his conclusions and that Mr. Adams's testimony should have been afforded greater weight.

Guideline A-2 promotes design that enhances visual interest and variety in downtown Seattle's skyline. Guideline B-2 fosters design that creates a transition in bulk and scale. Guideline B-3 encourages design that reinforces the positive urban form and architectural attributes of the immediate area. Guideline B-4 focuses on architectural expression as it relates to neighborhood context.

On review, Historic Waterfront fails to disclose the standard of review that ought to be employed. Presumably, given that the crux of its argument is that the facts were not properly applied to the law, it is seeking review under the clearly erroneous standard. When applying the clearly erroneous test under RCW 36.70C.130(1)(d), the facts are applied to the law. *Cingular Wireless*, 131 Wn. App. at 768. If the court is left with a definite firm conviction that, after applying the facts to the law, a mistake has been committed then reversal is permitted. *Id*. When applying the facts to the law, the court shall defer to factual determinations made by the highest forum below that exercised fact-finding authority. *Id*. The Examiner was the highest forum that exercised fact-finding authority. As noted earlier, we grant deference to the Examiner's determination of credibility.

24

Here, the Examiner recognized there was nothing in the record to suggest that Mr. Adams's testimony "should be . . . given greater credence than the Applicant and City's witnesses." AR at 253. After considering the testimony of the witnesses, the Examiner found that, although Mr. Adams presented alternative designs for the Project, he failed to establish that the current design of the building violated the Guidelines. *Id.* Consequently, the Examiner found Mr. Adams's testimony unpersuasive. *Id.*

Moreover, an examination of the record reveals AMLI was proactively following the DRB's recommendations on Guidelines A-2, B-2, B-3, and B-4. Mr. Hall testified the Project gained compliance with Guideline A-2 through, among other alterations, differing tower elevations, setbacks, and the location of mechanical equipment. Mr. Hall testified about compliance with Guidelines B-2 and B-3 through adjustment of the scale and setbacks of the building, the color of the glass, the color of the mullions, the color of the metal panels, and finish patterns. Concerning Guideline B-4, AMLI addressed the DRB's concerns by proposing changes to the massing of the roof, transitions from north to south towers, revising tower elevations, adjusting the parking level, and by adding a perforated metal screen at the parking level.[2]

---

[2] Many of the same design issues pointed out by the DRB in regard to the A-1 Guideline also applied to the B-4 Guideline.

Certainly Mr. Adams disagreed with AMLI's proposed modifications, but his objections to the Project being a "big three-dimensional box" fails to discount the other architects' testimony. CP at 430. The Examiner recognized that Mr. Adams demonstrated that his opinion differed from the other architects', but his statements "offered no affirmative evidence showing clear error on the part of the Director." AR at 253. Historic Waterfront's argument boils down to a disagreement with the Examiner's credibility determinations. Historic Waterfront may disagree with the Examiner's credibility determinations, or the weight it afforded to the testimony of competing witnesses, but that does not render such determinations error. We will not reweigh the evidence to reach a different conclusion. The Examiner properly applied the facts to the law. The Examiner's decision was not clearly erroneous.

IV.   ATTORNEY FEES

AMLI requests an award of attorney fees and costs under RCW 4.84.370. RCW 4.84.370 mandates an award of attorney fees to the prevailing party, provided the prevailing party on appeal was the prevailing party before the city and in all prior judicial proceedings. A prevailing party is entitled to attorney fees only if they successfully defend the decision in at least two courts. *Durland*, 182 Wn.2d at 77. A private party does not have to prevail solely on the merits to be awarded attorney fees. *Id*. at 77-78. Rather, a party may prevail on any issue, jurisdictional or otherwise. *Id*. at 78.

26

No. 39610-0-III
*Seattle Historic Waterfront Ass'n, et al. v. AMLI Residential, et al.*

A different test applies to public entities. A public entity shall be awarded attorney fees if its decision is upheld in superior court an on appeal. RCW 4.84.370(2). This rule implies that the public entity's decision is upheld on the merits. *Durland*, 182 Wn.2d at 78. Here, AMLI and the City are the prevailing parties on appeal. AMLI prevailed on both a jurisdictional issue and on the merits, and the City prevailed on the merits. Consequently, both are awarded reasonable attorney fees and costs.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Cooney, J.

WE CONCUR:

_____
Lawrence-Berrey, C.J.

_____
Staab, J.

27